TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-03-00440-CR






Celeste Beard Johnson, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT


NO. 9020236, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING






O P I N I O N



A jury found appellant Celeste Beard Johnson guilty of capital murder and injury
to an elderly individual. See Tex. Pen. Code Ann. §§ 19.03(a)(3), 22.04(a)(1) (West Supp.
2005). The State did not seek the death penalty for the capital murder, and the district court
sentenced appellant to life imprisonment. The jury assessed life imprisonment and a $10,000 fine
for the injury to an elderly person.

Appellant contends that the evidence is legally and factually insufficient to sustain
the guilty verdicts, and that the two convictions constitute double jeopardy. She also asserts that
the trial court erred by: (1) overruling her motions to quash the original indictment, permitting
the State to amend the indictment, and refusing to quash the amended indictment; (2) admitting
irrelevant evidence; (3) threatening a defense witness and refusing to admit a prior consistent
statement by this witness; (4) limiting her right to confront the witnesses against her; (5) admitting
in evidence a deposition given by appellant in a civil case; and (6) admitting summaries of
telephone records prepared by the State. (1) Finding no reversible error, we affirm the judgments
of conviction.


Evidence Sufficiency


In six points of error, appellant urges that the State failed to corroborate the
testimony of Tracey Tarlton, the accomplice witness whose testimony is essential to support the
convictions. In four additional points of error relating only to the capital murder conviction,
appellant asserts that the evidence is legally and factually insufficient to prove the alleged cause
of death and that the murder was committed for remuneration.


Background

Appellant met Steven Beard in 1993 while working as a waitress at the Austin
Country Club, where Beard was a member. Beard's wife of forty-two years, who was seriously
ill when he met appellant, died in October of that year. Appellant divorced her third husband,
Jimmy Martinez, in April 1994, and Beard and appellant were married in February 1995. At the
time of the marriage, appellant was thirty-two years old and Beard was seventy. Appellant had
thirteen-year-old twin daughters, Kristina and Jennifer, from a previous marriage. Kristina was
living with appellant in Austin, but Jennifer lived with her father in Washington. After appellant
married Beard, Jennifer moved to Austin to join her mother and sister, and the girls were adopted
by Beard following the death of their natural father. Beard was a man of considerable wealth, and
the family lived in an expensive subdivision in a home Beard commissioned following his
marriage to appellant.

In early 1999, appellant entered St. David's Pavilion, a psychiatric hospital, for
treatment of depression. There, she met Tracey Tarlton, who was another female patient. The
nature of the relationship between appellant and Tarlton was a matter of dispute at trial. Tarlton,
a lesbian, testified that she loved appellant and believed appellant loved her. The defense, on the
other hand, portrayed Tarlton as delusional and appellant as the object of Tarlton's obsessive
behavior. It was undisputed, however, that appellant and Tarlton continued to see each other
during the summer and fall of 1999, after they left Timberlawn. 

At about 3:00 a.m. on October 2, 1999, Tarlton entered Beard's bedroom and shot
him in the abdomen with a shotgun while he slept. The sound and pain woke Beard, who
summoned emergency help. The first responders found Beard lying in bed holding his side. 
Appellant and Kristina were in another bedroom of the house at the time of the shooting.

Beard was taken to a hospital where he remained in intensive care for several
weeks. As his condition gradually improved, he was moved to a regular hospital room and then
to a rehabilitation center. Beard was discharged and sent home with appellant on January 18,
2000. The following day, appellant called Beard's doctor and demanded that he be readmitted
to the hospital. After examining Beard, the doctor ordered him readmitted. Beard's condition
deteriorated at the hospital, and he died on January 22, 2000.

Tarlton was arrested on October 8, 1999, and charged with injury to an elderly
individual. The charge was increased to capital murder after Beard died. Tarlton ultimately
pleaded guilty to murder and agreed to cooperate with the State in exchange for a twenty-year
sentence. She testified for the State at appellant's trial. The jury charge authorized appellant's
convictions solely as a party to Tarlton's conduct. See Tex. Pen. Code Ann. § 7.02(a)(2) (West
2003).


Tarlton's testimony

Tarlton testified that she entered St. David's Pavilion in February 1999 for
treatment of a bipolar disorder. She met appellant in the hospital and they became friends. 
Appellant told Tarlton that she had married Beard in order to secure the custody of her two
daughters, but that she now felt trapped in a loveless relationship. Tarlton testified, "[H]er
portrayal of what was going on was that she felt trapped by this man who was slowly killing her,
slowly or quickly killing her, that she couldn't get out from under him psychologically or
emotionally." Tarlton said she believed everything appellant told her about Beard. She said, "I
just felt like he was this man who had a whole bunch of money and he pushed his way through
all this staff of people and he pushed his wife around and he, you know, grabbed here and grabbed
there and didn't have any concern at all for anybody else, including her."

Tarlton described appellant as flirtatious, and she said that they developed a
romantic relationship while at St. David's. The two women arranged to be transferred to
Timberlawn Hospital in Dallas, where they initially shared a room and where Tarlton said they
first became sexually intimate. After a staff member saw Tarlton giving appellant a massage,
Tarlton was moved to a separate room. Appellant told Tarlton that Beard was responsible for
their separation. Later, while outpatients at Timberlawn, appellant and Tarlton met in motel
rooms and their relationship became more intense. After appellant and Tarlton returned to Austin,
they continued to see each other regularly during the summer and fall of 1999.

Tarlton testified that appellant spent the night at Tarlton's house several times a
week. Appellant told Tarlton that she put sleeping pills in Beard's food and replaced his vodka
with Everclear, a product that is almost pure grain alcohol. In this way, she caused Beard to pass
out, leaving her free to spend nights away from the house. Appellant also expressed the hope that
this regimen would hasten Beard's death. She told Tarlton, "[H]e's an old man, he's going to die
soon but not soon enough, and I'm just going to help him along wherever I can." Tarlton
recounted a night in the fall of 1999 when she received a telephone call from appellant asking her
to come to appellant's house. When Tarlton got there, she saw Beard unconscious at the dining
room table. Tarlton helped appellant move Beard to the floor, then appellant placed a plastic trash
bag over his head in an unsuccessful attempt to asphyxiate him. Appellant also attempted without
success to poison Beard with botulin that she and Tarlton grew with instructions they found in a
book of poison recipes. Tarlton explained that she was willing to help appellant in these schemes
because "I did believe everything she told me about what was going on. And I just felt real bad
for her, and . . . from what I knew, he was a terrible man and he wouldn't let her up."

Beard made plans to spend three weeks in Europe with appellant in October 1999. 
Appellant told Tarlton that she dreaded the trip and feared that Beard's emotional abuse would
cause her to kill herself while on the trip. In late September, only a few days before the trip was
to begin, appellant asked Tarlton to shoot Beard. Appellant knew that Tarlton had once hunted
and continued to shoot skeet, and that she owned a shotgun. Tarlton said that she initially refused
appellant's request, but she changed her mind when appellant threatened to commit suicide. 
Tarlton testified that she asked appellant to take care of three things if she were arrested: find
homes for her pets, pay her legal fees, and support her in jail. Appellant promised to do so.

Tarlton testified that she met appellant at the Beard residence on the afternoon of
Friday, October 1, to plan the shooting. Appellant told Tarlton that she had arranged for Jennifer
to be away from the house that night, but that appellant and Kristina would be at home and in
another bedroom. Appellant showed Tarlton where to park, how to enter the house, and where
Beard would be sleeping. When Tarlton mentioned that her shotgun would automatically eject
the spent shell, appellant promised that she would find the shell and dispose of it. Appellant
suggested that Tarlton shoot Beard in the stomach, as that would be less messy. She said that if
Beard did not die immediately, she would wait for him to bleed to death before calling the police. 
Later that night, appellant came to Tarlton's residence and told Tarlton to park in a different
location in order to avoid being seen by neighbors. She told Tarlton that Beard was already in
bed asleep, and assured her that the house would be unlocked and the security system would be
off.

Tarlton drove to the Beard residence shortly after 2:00 a.m. that night. She found
the gate open as planned. She parked near the girls' bedroom and entered the house through an
unlocked door near Beard's bedroom. She then walked into the bedroom, shot Beard in the
stomach, returned to her car, and drove away. Tarlton did not dispose of the shotgun because it
was personalized and she was confident that appellant would collect the spent shell as she had
promised. In fact, the spent shell was found by the police soon after they arrived at the house. 
Without knowing this, Tarlton gave the shotgun to the police when they came to her house to
question her. Tarlton was arrested a few days after the shooting and released on bail.

Tarlton said that she and appellant remained in contact during the weeks following
the shooting. In addition to telephone calls, they often met in a park that was convenient to both
the hospital and Tarlton's workplace. Shortly before Beard's discharge, appellant told Tarlton
that she was not going to hire home health care workers because she intended to reinfect Beard's
wound. After Beard died, most contact between Tarlton and appellant ended. Tarlton called
appellant in June 2000 after not hearing from her for three weeks. Appellant told Tarlton that she
did not want to talk to her. In July, Tarlton learned that appellant had remarried.


Corroborating evidence

Tarlton was an accomplice witness. A conviction cannot be had upon the testimony
of an accomplice unless the testimony is corroborated by other evidence tending to connect the
defendant with the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 1995). Corroboration
is not sufficient if it merely shows the commission of the offense. Id. It is not necessary that the
corroborating evidence directly connect the defendant to the crime or be sufficient in itself to
establish the defendant's guilt. Cathey v. State, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). 
Article 38.14 is satisfied if the combined weight of the nonaccomplice evidence tends to connect
the defendant to the offense. Id.

Several witnesses, including appellant's daughters Kristina and Jennifer, testified
that appellant made no secret of her dislike for Beard. Although appellant was pleasant to Beard
in person, she called him various derogatory names behind his back and often expressed her wish
that he were dead. Appellant's daughters and their friends saw appellant substitute Everclear for
vodka in Beard's drinks and mix sleeping pills into his food. They also described how appellant
would give Beard sleeping pills instead of his other medications. Appellant was openly dreading
the October trip to Europe with Beard. She told the receptionist at her beauty salon, "She hated
the bastard. She wished he was dead. She didn't know how she would last on a vacation."

Most of Beard's assets, which at one time totaled over seven million dollars, were
held in a revocable trust. At the time of their marriage, appellant and Beard signed a marital
agreement by which Beard promised to give appellant one million dollars during the marriage. 
If the marriage ended in divorce, appellant would receive $500,000. In January 1997, Beard
transferred $500,000 from his trust to a revocable trust created for appellant. This payment
constituted one-half of the promised marital payment and also satisfied Beard's obligation to
appellant should they divorce. The trustee testified that appellant's trust was depleted within six
months of its creation. During October 1999 through January 2000, the four months following
the shooting, appellant ran up expenses of more than $700,000 which were presented to the trustee
of Beard's trust for payment. Under the terms of Beard's will, appellant inherited the residence
and lake house and one-half of Beard's other assets.

Appellant's daughters were aware of her relationship with Tarlton. Kristina had
a key to Tarlton's house and sometimes went there to wake up appellant when she spent the night. 
Employees of the book store managed by Tarlton also knew about the relationship. They testified
that appellant often visited Tarlton at the store and described seeing them together at social
functions. In July 1999, appellant hosted a party for the store's employees at the Beard lake
house. Appellant was photographed at the party sitting in Tarlton's lap, and other party-goers
testified to seeing appellant and Tarlton kissing and holding hands. On the morning after the
party, Kristina and her boyfriend, Justin Grimm, went to the lake house to clean up and found
appellant and Tarlton together in bed.

Throughout 1999, appellant was also having an affair with her former husband,
Jimmy Martinez. Kristina testified that she occasionally drove appellant to Martinez's house to
spend the night, and that appellant instructed her on these occasions to tell Beard that she had slept
in Kristina's room. In August 1999, appellant held a high school graduation party for the twins
at Martinez's house.

Jennifer testified that on October 1, 1999, appellant suggested that she and her
boyfriend, Christopher Doose, and another friend should spend the weekend at the lake house. 
This was the first time appellant had allowed Jennifer to use the lake house without first asking
permission. The teenagers naturally accepted the offer. They testified that between 9:00 and
10:00 that night, appellant came to the lake house with Beard's dog, Megan. They were surprised
to see Megan with appellant, as the dog was old and infirm and always slept with Beard. 
Appellant told them that Beard was drunk and had been hitting Megan. This, too, was unusual,
because Beard was very fond of the dog and had never been known to mistreat her. They agreed
to keep Megan with them at the lake house that night. Appellant, who seemed nervous and
distracted, left the lake house sometime after 10:30 p.m.

That same night, Kristina and Grimm went to dinner and a movie. Although
Kristina did not ordinarily have a curfew, appellant had instructed her to be home by midnight. 
They arrived at the Beard house at about 11:00 p.m. Grimm often spent the night at the Beard
house with appellant's knowledge and permission, but appellant had told him earlier that he could
not stay that night. He left around midnight. Kristina testified that appellant was not at home
when her boyfriend left and she went to bed. Kristina said that she awoke later that night and saw
appellant standing in the doorway of her bedroom. Appellant told her that someone was at the
front door and asked her to investigate. Kristina went to the front of the house and looked
outside. She saw the lights of the emergency vehicles that had responded to Beard's call for help
following the shooting.

The first responders found the gates to the property open and did not encounter any
armed security devices. The doors of the house appeared to be unlocked. The first police officer
to enter the house came in through a side entrance and found Beard. Then he walked to the front
of the house to admit other emergency workers and encountered appellant and Kristina. When
she was told that there was a medical emergency, appellant became hysterical. But the hysterics
were "up and down." One officer remembered that appellant "would go from being very upset
to not very upset and it seemed at times she was crying but there weren't any tears or anything
like that."

Appellant and Kristina followed Beard to the hospital, where they were joined by
Jennifer and Doose who drove in from the lake house. Officer Paul Knight spoke to the young
people at the hospital and asked them if they knew who might have shot Beard. They immediately
gave him Tarlton's name. Later that day, appellant, who did not know that they had already done
so, instructed Kristina, Jennifer, and their boyfriends not to mention Tarlton to the police. 
Kristina testified that appellant also told her not to speak to the police, but only to appellant's
attorney, and to tell the lawyer that appellant loved Beard and would never hurt him. After Beard
died, appellant told her daughters and their boyfriends that Beard's dying wish was that they not
cooperate with the police investigation.

Acting on the tip from appellant's daughters, Knight and Officer Rick Wines
interviewed Tarlton at her house on the afternoon of October 2. Tarlton gave the officers an
exculpatory statement and allowed them to take her shotgun. Tarlton was arrested on October 8
after ballistics tests showed that the shell found in Beard's bedroom had been fired by her shotgun. 
While searching Tarlton's house, the officers found photographs of Tarlton with appellant and
calendar entries describing some of their activities. Appellant said nothing to the police when she
was told that Tarlton had been arrested.

On October 4, Knight and Wines went to the hospital to speak to Beard. Appellant
met them there and told them that Beard did not wish to see them. She also revoked the consent
she had previously given to search the Beard house. The following day, the officers found a sign
posted outside Beard's hospital door saying, "No visitors including police." The sign also stated
that no visitors were allowed except when appellant was present. After learning that a family
friend had tried to visit Beard in the hospital, appellant telephoned him and angrily said that he
"was not allowed to come back and visit Steve ever again."

Summaries of cell phone billing records introduced by the State document hundreds
of calls between phones commonly, but not exclusively, used by appellant and phones used by
Tarlton. Between August 29 and October 1, 1999, ninety-eight calls totaling 336 minutes were
made between these phones, including eight calls totaling fifteen minutes on the day of the
shooting. The calls continued following the shooting. Ninety-four calls totaling 389 minutes were
made between these phones from October 2, 1999, through January 26, 2000. When asked by
her daughters why she was talking to Tarlton, appellant denied doing so.

In January 2000, Jennifer and Kristina had all the Beard telephone numbers
changed in an effort to stop Tarlton's calls. On the day Beard died, however, Grimm found an
unfamiliar cell phone in appellant's car. The evidence shows that this so-called "secret" cell
phone belonged to Tarlton. The phone records show that approximately fifty calls were made
between this phone and another cell phone belonging to Tarlton from January 8 to January 26,
2000. Another thirty-five calls were made between these phones from January 27 to June 15,
2000. Although the "secret" phone belonged to Tarlton, there was testimony that it was regularly
seen at the Beard house and in appellant's possession.

Appellant, Kristina, Jennifer, Grimm, and Doose rode together in a limousine on
the day of Beard's funeral. Appellant laughed and joked on the way to the funeral home, but her
demeanor changed upon their arrival and she began to weep. After the funeral, appellant was
again in a good mood. She had the limousine stop in a shopping center owned by Beard, entered
one of the stores, and told the employees that she was now the owner and "they could kiss her ass
like they kissed Steve's ass." 

Soon after Beard's death, appellant hired Donna Goodson to be her personal
assistant. Goodson testified that appellant "slept all day and partied all night." Goodson
accompanied appellant on her frequent visits to Austin night spots and said that appellant became
involved with several men, including a bartender named Cole Johnson who appellant later
married. On February 10, 2000, Goodson went to the Houston rodeo with appellant. Appellant
arranged dates for herself and Goodson while in Houston.

From Houston, appellant and Goodson continued on to Lake Charles, Louisiana,
to visit a casino. During the Lake Charles trip, appellant told Goodson that her attorney had said
"it would take two pieces of evidence to indict somebody for murder, one would be the gun and
the other would be Tracey [Tarlton]." Goodson remarked that Tarlton might be cooperating with
the police. Appellant asked Goodson if she knew anyone who could "get rid of Tracey." 
Goodson told appellant "anybody could get rid of anybody for the right amount." Upon their
return to Austin, appellant gave Goodson $500 to hire a hit man to kill Tarlton. She also showed
Goodson Tarlton's house and automobile. As time passed and Tarlton was not killed, appellant
began to pressure Goodson. Goodson said she counseled patience and asked appellant for more
money. Appellant made additional payments to Goodson of $2500, $2500, and $7460. Appellant
tried without success to hide these payments. When Kristina asked appellant about the money she
was giving Goodson, appellant became irate and threatened to "physically kill" her. Eventually,
appellant told Kristina that she had hired a hit man to kill Tarlton but had "called it off."

We find the combined weight of the nonaccomplice evidence to be more than
sufficient to connect appellant to the offense and thus to corroborate Tarlton's accomplice
testimony. The evidence shows that appellant was unhappy in her marriage and often expressed
the wish that Beard would die. In fact, appellant was shown to have regularly tampered with
Beard's food and drink in a manner that was dangerous to his health. Appellant began spending
lavishly even before Beard died, and she was noticeably elated following his death. While
evidence of motive is alone insufficient to corroborate an accomplice, it is a circumstance that may
be considered together with other corroborative evidence. Leal v. State, 782 S.W.2d 844, 852
(Tex. Crim. App. 1989); and see Duff-Smith v. State, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985)
(defendant's "extreme haste to enjoy the fruits of [deceased's] estate" considered corroborative
of accomplice testimony).

Appellant had been intimately involved with Tarlton for over six months before
Tarlton shot Beard. During the summer and early fall of 1999, appellant regularly spent the night
at Tarlton's house, gave a party on her behalf, and often spoke to her on the telephone. In fact,
appellant spoke to Tarlton several times on the day of the shooting. While this contact with the
accomplice may not, in itself, be sufficient to corroborate Tarlton's testimony, it is corroborative
when considered in light of the other evidence. See Wincott v. State, 59 S.W.3d 691, 698 (Tex.
App.--Austin 2001, pet. ref'd).

Appellant's atypical behavior on the day of the shooting tends to connect her to the
offense. She encouraged one of her daughters to spend the night of the shooting at the Beard lake
house, and she took the dog that always slept with Beard to the lake house that night. After the
shooting, appellant secretly remained in contact with Tarlton and attempted to keep Tarlton's
name out of the investigation. Indeed, appellant was generally uncooperative with the police and
encouraged her daughters and their friends to be the same. When it was suggested to appellant
that Tarlton might cooperate with the police, appellant spent over $12,000 in an attempt to hire
someone to kill Tarlton. Appellant's efforts to impede the investigation of Beard's shooting, and
her attempts to first protect Tarlton and then to kill her, also tend to connect appellant to the
offense.

Finding the evidence sufficient to corroborate the accomplice witness testimony,
we overrule points of error four through nine. We now turn to appellant's further contention that
even when Tarlton's accomplice testimony is considered, the evidence is legally and factually
insufficient to sustain the capital murder conviction. Appellant specifically contends that the
evidence does not support the jury's verdict with regard to the cause of death and the
remuneration element.


Cause of death

Appellant contends that the evidence is legally and factually insufficient to prove
that Beard was murdered "by shooting him with a firearm" as alleged in the indictment. She
argues that Beard's death was the result of an infection unrelated to the shooting.

Beard was originally taken to Brackenridge Hospital, where he was treated by Dr.
Robert Coscia, a general surgeon and the hospital's director of trauma care. Coscia testified that
Beard had a hole the size of an orange in his upper right abdomen and that bird shot had damaged
several internal organs. Beard's colon was seriously damaged and posed an infection risk. Coscia
removed a large portion of Beard's colon and created an ileostomy. Skin grafts were required to
close the wound.

Beard remained in the hospital until December 7, 1999. By that time, his condition
had improved enough for him to be transferred to the HealthSouth rehabilitation center. There,
he received physical therapy preparatory to going home. Beard was released from HealthSouth
on January 18, 2000. Beard was at this time confined to a wheelchair and experienced
considerable pain whenever he was moved to a regular chair or bed. The ileostomy was still in
place, and the gunshot wound itself required daily cleaning and observation. There is evidence
that Beard had a rash in his groin area at the time of his discharge from HealthSouth.

On January 19, appellant called Dr. Coscia to complain about the quality of care
Beard had received at HealthSouth. At her request, Coscia examined Beard in the Brackenridge
emergency room. Coscia testified that Beard "did not look that bad," but he decided to admit him
to the hospital for treatment of "a significant yeast infection in his perineum" or groin area. 
Beard was also reporting chest pain and his white blood cell levels were elevated.

At about 8:00 a.m. on January 22, Beard's chest pain worsened, his pulse rate went
up, his blood pressure fell, his temperature spiked to over 102 degrees, and he became delirious. 
A blood test was positive for cocci, which indicated that Beard had a staphylococcal or
streptococcal infection. An antibiotic was ordered but was not administered until 1:00 p.m. 
Beard died later that afternoon. The attending physician, who was not Dr. Coscia, recorded the
cause of death as septic shock.

Dr Roberto Bayardo, the Travis County Medical Examiner, performed the autopsy
on Beard's body. Bayardo testified that the immediate cause of death was pulmonary emboli. 
Bayardo was of the opinion that these emboli, or blood clots, had formed in Beard's legs as a
result of the months of inactivity following the shooting. The emboli traveled to the lungs and
lodged in the pulmonary arteries, blocking the flow of blood and preventing the oxygenation
process. Bayardo identified photographs taken during the autopsy as showing large clots in
Beard's pulmonary arteries. Bayardo testified that Beard also had bronchopneumonia and sepsis
resulting from an infection that began in the lungs. Bayardo's autopsy report stated that the cause
of Beard's death was pulmonary embolism and bronchopneumonia with sepsis, as a complication
of the shotgun wound. Dr. Coscia testified that he agreed with Dr. Bayardo's conclusion
regarding the cause of death.

Dr. Terry Satterwhite, an infectious disease expert called by the defense, testified
that he had examined Beard's medical records from the time of the shooting. Satterwhite noted
that blood tests taken on the morning of January 22 indicated that Beard had a group A
streptococcal infection. Such bloodstream infections are very serious and often fatal. Beard also
had numerous risk factors that increased the seriousness of the infection: he was obese, alcoholic,
diabetic, and suffered from chronic obstructive pulmonary disease. Satterwhite opined that Beard
died from septic shock resulting from the strep infection. Satterwhite believed that the strep
entered Beard's body through the groin infection, and that Beard's death was not related to the
shotgun wound.

Dr. Charles Petty, a forensic pathologist, also testified for the defense. Petty had
examined Beard's medical records and the autopsy report prepared by Dr. Bayardo. He testified
that the shotgun wound "was doing quite well, and there was no reason to suspect that he would
die of that at all." Petty agreed with Satterwhite that Beard's death was caused by septic shock
resulting from the streptococcal infection. Because he found no indication that the shotgun
wounds were infected, Petty also believed that the infection began in the groin area and was
unrelated to the wounds Beard suffered on October 2.

When there is a challenge to the sufficiency of the evidence to sustain a criminal
conviction, the question presented is whether a rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324
(1979) (legal sufficiency); Griffin v. State, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981)
(legal sufficiency); Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual
sufficiency). In a legal sufficiency review, all the evidence is reviewed in the light most favorable
to the verdict, and it is assumed that the trier of fact resolved conflicts in the testimony, weighed
the evidence, and drew reasonable inferences in a manner that supports the verdict. Griffin, 614
S.W.2d at 159 (citing Jackson, 443 U.S. at 318-19). In a factual sufficiency review, all the
evidence is considered equally, including the testimony of defense witnesses and the existence of
alternative hypotheses. Orona v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). 
Although due deference still must be accorded the fact finder's determinations, particularly those
concerning the weight and credibility of the evidence, the reviewing court may disagree with the
result in order to prevent a manifest injustice. Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim.
App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the
proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt
beyond a reasonable doubt. Zuniga, 144 S.W.3d at 484-85; see Johnson, 23 S.W.3d at 11.

It was for the jury, as trier of fact, to resolve the conflicting expert opinions
regarding the cause of Beard's death. Viewing the evidence in the light most favorable to the
jury's verdict, and thus assuming that the jury believed the State's experts and discounted the
testimony of the defense experts, the evidence is clearly sufficient to support a finding beyond a
reasonable doubt that Beard died as a result of the shotgun wound inflicted by Tarlton on October
2. Even when all the evidence is considered equally, including the testimony of the defense
experts, we still must give due deference to the jury's credibility determinations. The State's
evidence is not so weak or the defensive evidence so strong as to preclude the jury from finding
beyond a reasonable doubt that Beard died as a result of the shotgun injury. Points of error ten
and eleven are overruled.


Remuneration

The indictment alleged that Beard was murdered "for remuneration and the promise
of remuneration, namely, money and the estate of Steven Beard and the assets of a trust created
by Steven Beard." See Tex. Pen. Code Ann. § 19.03(a)(3). Appellant argues that the State failed
to prove this allegation because during Beard's life, she enjoyed financial benefits equal to or
greater than the benefits to which she was entitled following his death. Appellant points to
evidence that despite Beard's consternation at her lavish spending, he imposed no effective limit
on it. Upon Beard's death, however, his assets passed into a trust for appellant's benefit and thus
subjected appellant's spending to the supervision of a trustee who was less generous than Beard. 
Appellant asserts that "[a]t a minimum, remuneration implies an increase rather than a decrease
in existing benefits."

We are not persuaded by this argument. The term "remuneration" as used in
section 19.03(a)(3) "encompasses a broad range of situations, including compensation for loss or
suffering and the idea of a reward given or received because of some act." Beets v. State, 767
S.W.2d 711, 734 (Tex. Crim. App. 1988) (op. on reh'g). The conduct proscribed by section
19.03(a)(3) includes the killing of another person in order to receive, or for the purpose of
receiving, some benefit or compensation. Id. (quoting McManus v. State, 591 S.W.2d 505, 513
(Tex. Crim. App. 1979)). The focus is on the actor's intent or state of mind: did she kill in the
expectation of receiving some financial benefit or compensation? Id. at 735. Thus, if appellant
participated in Beard's murder for the purpose of receiving his money and other assets, she acted
for remuneration even if she did not receive the expected financial benefit.

The evidence shows that appellant was familiar with the terms of Beard's will,
under which she received the primary residence, the lake house, and one-half of Beard's other
assets, which were worth several million dollars. But so long as he lived, Beard was free to
change his will to leave appellant only the additional $500,000 to which she was entitled under
the marital agreement, or to give appellant the remaining $500,000 during his lifetime and
bequeath her nothing. Moreover, appellant had already received and spent the $500,000 to which
she was entitled upon divorce under the terms of the marital agreement, and thus she could have
been left with nothing had Beard divorced her. Although appellant told Tarlton that she had not
married Beard for his money, she once told Tarlton that she did not divorce Beard "because she
would only get $500,000." Viewing the evidence in the light most favorable to the verdict, a
rational trier of fact could find beyond a reasonable doubt that appellant solicited, encouraged, and
aided Tarlton to kill Beard in order to secure Beard's assets and estate under the existing will. 
See Tex. Pen. Code Ann. § 7.02(a)(2). Even when all the evidence is viewed in a neutral light,
including the restrictions that were imposed on appellant's access to Beard's estate, the jury was
justified in finding beyond a reasonable doubt that appellant acted for the purpose of receiving the
alleged remuneration.

In a prosecution in which an actor's criminal responsibility is based on the conduct
of another, the actor may be convicted on proof of commission of the offense and that she was
a party to its commission. Tex. Pen. Code Ann. § 7.03 (West 2003). Thus, the question arises
whether, in order to convict appellant as a party to capital murder for remuneration, it was
necessary for the State to prove at appellant's trial that Tarlton, the primary actor, killed Beard
for remuneration. See Ex parte Thompson, 179 S.W.3d 549, 555-57 (Tex. Crim. App. 2005)
(construing penal code sections 7.02(a)(2) and 7.03). Assuming that such proof was necessary,
we find that the evidence is legally and factually sufficient to supply it. Tarlton knew that Beard
was a wealthy man, and the jury could reasonably infer that she knew that appellant was the
primary beneficiary under Beard's will. Tarlton also testified that she and appellant would
sometimes discuss their future lives together: "We went back and forth about it. But she had an
idea that we would go and live at the lake house." From this, the jury could reasonably infer that
Tarlton, as appellant's lover, anticipated that she would indirectly share the money and assets that
would flow to appellant under the terms of Beard's will. Applying the relevant standards of
review, we find that the evidence is legally and factually sufficient to support a finding beyond
a reasonable doubt that Tarlton murdered Beard for remuneration.

Points of error twelve and thirteen are overruled.


Indictment


Appellant contends that the trial court erred by overruling her motions to quash the
original indictment, permitting the State to amend the indictment, and refusing to quash the
amended indictment. Appellant argues that the indictment, both as filed and as amended, did not
provide adequate notice of the accusation against her. See U.S. Const. amends. V, XIV; Tex.
Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 21.11 (West 1989). She further argues that
by permitting the State to amend the indictment, the court violated her constitutional and statutory
right to have all material accusations presented to a grand jury. See U.S. Const. amends. V, XIV;
Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.05 (West 2005).

As filed in March 2002, count one of the indictment alleged without elaboration
that appellant murdered Beard "for remuneration." In October 2002, appellant moved to quash
the indictment because "[n]either the remuneration nor the remunerator is identified" and because
it did not "identify what remuneration Defendant was supposed to have received from the
unnamed remunerator." (2) In a letter to the parties dated November 27, 2002, the trial court stated
that "the court is going to require the state to plead facts, acts or conduct that constitute
solicitation and remuneration." The letter went on to state that the court would sign an order
quashing the indictment on December 20. On December 19, the State moved to amend the
indictment to allege that appellant murdered Beard "for remuneration and the promise of
remuneration, namely, money and the estate of Steven Beard and the assets of a trust created by
Steven Beard." Following a hearing on January 6, 2003, the court granted the motion to amend
over appellant's objection, and conforming alterations were made to the face of the filed
indictment.

Contrary to the allegation made in point of error one, the trial court did not
overrule appellant's motions to quash the original indictment. To the contrary, it is clear from
the record that the court would have quashed the indictment had the State not amended it. 
Because the indictment was amended, any question regarding the adequacy of the original
indictment is moot. Point of error one is overruled.

Appellant argues that the amended indictment remained defective because it did not
name the person providing the remuneration or the person receiving the remuneration:


The amendment did not clarify whether "money" was to be paid by or to
Appellant. If money was to be paid to Appellant, the amendment did not clarify
who the payer was. If money was to be paid by Appellant, it did not clarify who
was to receive it. Moreover, amending to allege that "remuneration" included
"the estate of Steven Beard and the assets of a trust created by Steven Beard" was
entirely uninformative. That addition did not clarify who was supposed to get the
estate and the assets of a trust as remuneration, or who would provide it.



Appellant cites Janecka v. State, a capital murder case in which the indictment alleged that the
defendant "committed the murder for remuneration and the promise of remuneration, namely,
money." 739 S.W.2d 813, 816 (Tex. Crim. App. 1987). The court of criminal appeals held that
the indictment did not give the defendant adequate notice because it did not allege the name of the
person providing the remuneration. Id. at 820. (3)

Janecka was a murder for hire case. See id. at 835 (Teague, J., dissenting and
summarizing underlying facts). It is reasonable in such a case to require the State to identify the
alleged payor and payee in the indictment. But the cause now before us is not a murder for hire
case. Instead, appellant was accused of murder for remuneration in its broader sense: the killing
of another person in order to receive, or for the purpose of receiving, some benefit or
compensation. Beets, 767 S.W.2d at 734. In such a case, the existence of a "culpable promisor"
is not required to establish remuneration. Id. at 735. It follows that the amended indictment was
not objectionable for failing to name the person who was to pay the alleged remuneration. At the
same time, it is obvious from reading the amended indictment that appellant was the person to
whom the alleged remuneration was to be paid. The trial court did not err by refusing to quash
the amended indictment. Point of error three is overruled.

We also find no merit in appellant's complaint that the amendment of the indictment
denied her the constitutional right to a grand jury indictment. The Fifth Amendment indictment
clause does not apply to the states. Hurtado v. California, 110 U.S. 516, 520 & 538 (1884). The
inferential requirements of article I, section 10 of the Texas Constitution were abolished by the
adoption of article V, section 12(b), which provides that the practice and procedures relating to
indictments, including amendment, "are as provided by law." Studer v. State, 799 S.W.2d 263,
272 (Tex. Crim. App. 1990). The requisites of an indictment now stem from statutory law alone. 
Id. 

In general, an indictment may be amended as to form or substance at any time
before the date the trial on the merits commences. Tex. Code Crim. Proc. Ann. art. 28.10(a)
(West 1989). An indictment may not be amended over the defendant's objection, however, if the
amended indictment would allege an additional or different offense or if the substantial rights of
the defendant would be prejudiced. Id. art. 28.10(c). The State did not amend the indictment to
allege a new or different offense. Both as filed and as amended, the indictment alleged the offense
of capital murder for remuneration. See Flowers v. State, 815 S.W.2d 724, 728 (Tex. Crim.
App. 1991) (construing article 28.10(c)). Nor did the amendment prejudice any substantial right. 
To the contrary, the amendment served to satisfy appellant's motion to quash demanding greater
notice regarding the remuneration element. Point of error two is overruled.


Relevancy Issues


Appellant urges that the trial court erred by admitting evidence she deems to be
irrelevant, unfairly prejudicial, and/or improper character-conformity evidence. Evidence is
relevant if it has any tendency to make the existence of a fact that is of consequence to the
determination of the action more or less probable than it would be without the evidence. Tex. R.
Evid. 401. Although relevant evidence is generally admissible, it may be excluded if its probative
value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 402, 403. 
Evidence of other crimes, wrongs, or acts is not admissible if it is relevant only to prove the
character of a person in order to show action in conformity therewith, but it may be admissible
for some other purpose. Tex. R. Evid. 404(b). We review the trial court's decision to admit
evidence for an abuse of discretion. Montgomery v. State, 810 S.W.2d 372, 390 (Tex. Crim.
App. 1991) (op. on reh'g). 


Beard divorce petition

The State was permitted to offer evidence that Beard filed for divorce less than a
year after marrying appellant, only to withdraw the petition two months later. Contrary to
appellant's argument, this evidence was relevant to the question of motive. Under the terms of
the marital agreement, appellant would have received upon divorce a relatively small settlement
compared to what she was to receive under Beard's will. Evidence that Beard had once filed for
divorce tended to show that appellant had a reason to fear that Beard might divorce her in the
future and thus to hasten his death before he could do so. In her brief, appellant makes no effort
to explain how this evidence had the potential to impress the jury in some irrational way so as to
render it more prejudicial than probative. See id. at 390. No abuse of discretion is shown. Point
of error fourteen is overruled.


Martinez divorce

Appellant contends that the trial court erred by permitting the State to cross-examine Martinez regarding the details of his divorce from appellant. She also complains of the
admission in evidence of the petition and decree from that divorce.

The record reflects that the petition and decree were offered by the State, but
appellant's objection was sustained and they were not admitted. We also find nothing in the
record to support her claim that the State was permitted to question Martinez about "the specific
factual basis for the divorce." Finding no support for the contentions made, we overrule point
of error nineteen.


Martinez affair

Amy Cozart, a friend of appellant's daughters, testified that appellant told her that
she was having an affair with Martinez, and that she did not want Beard to know about the affair
because he might seek a divorce. Appellant was also fearful that her infidelity, if known, would
effect her rights under the marital agreement. Cozart testified that appellant asked her to "lie for
her" if Beard were to find out about the affair.

This evidence was also relevant to motive. Although her infidelity and her efforts
to hide it cast appellant in a bad light, it was within the scope of the trial court's discretion to
determine that the probative value of this evidence was not substantially outweighed by the danger
of unfair prejudice. We also note that Martinez, called as a defense witness, testified to the affair
with appellant. Points of error fifteen and sixteen are overruled.


Anonymous letter

State's exhibit 153A is a copy of an anonymous letter dated October 27, 1999, and
addressed to Laylan Copelin, a newspaper reporter who was involved in the coverage of the Beard
shooting. The letter purports to be written by a friend of appellant. It describes appellant as "one
of the most giving people in the world" and her marriage to Beard as a "caring relationship with
a husband that absolutely adores her." The letter contains an account of appellant's "difficult and
traumatic life," including sexual abuse by her father, physical abuse by her first husband, and a
number of diseases including ovarian cancer. The letter says that appellant befriended Tarlton
because she had suffered "similar trauma issues," and that she had made it clear to Tarlton that
"their friendship was nothing more than that." The letter laments that "[b]y the time we all
started to see the signs of Tracey being obsessed with Celeste it was obviously too late." The
letter concludes by saying that appellant "trusted someone who is crazy" and "feels tremendous
guilt over the entire situation even though Steven has told her not to give it another thought." The
letter pleads with Copelin to treat appellant fairly in his stories.

Kristina's boyfriend testified that he found the letter in a file saved on the Beard
family computer. In his own testimony, Copelin confirmed receiving the letter. In addition to
asserting that the exhibit was inadmissible under rules 403 and 404(b), appellant urges that the
letter was hearsay and not properly authenticated. See Tex. R. Evid. 802, 901.

The requirement of authentication or identification as a condition precedent to
admissibility is satisfied by evidence sufficient to support a finding that the matter in question is
what its proponent claims. Tex. R. Evid. 901(a). In addition to being found on the Beard
computer, the letter contained numerous intimate details of appellant's life, confirmed by other
evidence, that collectively support an inference that she was the author: her previous marriages,
the suicide of her second husband, meeting Tarlton while both were receiving psychiatric
treatment, the upcoming trip to Europe. Given these circumstances, it was a reasonable exercise
of the trial court's discretion to conclude that the letter was written by appellant. Id. rule
901(b)(4); see United States v. McMahon, 938 F.2d 1501, 1509 (1st Cir. 1989) (applying Fed.
R. Evid. 901(b)(4)); United States v. Newton, 891 F.2d 944, 947 (1st Cir. 1997) (same). And
because the letter was shown to be written by appellant, it was not hearsay when offered against
her. Tex. R. Evid. 801(e)(2)(A) (admission by party-opponent).

Defending the admission of the letter pursuant to rule 404(b), the State urges that
the letter was an effort by appellant to influence newspaper coverage of the shooting and thereby
to indirectly influence the police investigation. Thus, argues the State, the letter was relevant to
show appellant's consciousness of guilt. See Torres v. State, 794 S.W.2d 596, 598 (Tex.
App.--Austin 1990, no pet.) (attempts to suppress or fabricate evidence admissible as indicating
consciousness of guilt). The opinions cited by the State involve evidence that the defendant sought
to intimidate a witness. See Wilson v. State, 7 S.W.3d 136, 140-41 (Tex. Crim. App. 1999);
Torres, 794 S.W.2d at 598-99. We are not persuaded that exhibit 153A is comparable evidence. 
On the other hand, appellant makes no argument in support of her assertion that the letter was
prejudicial extraneous misconduct evidence. Given the volume of evidence introduced in this
cause, we are satisfied that the admission of this exhibit, if error, did not harm appellant's
substantial rights. See Tex. R. App. P. 44.2(b). Point of error seventeen is overruled.


Portrait

Tarlton testified that appellant commissioned a painting of herself and her daughters
that hung in the Beard residence. As described by Tarlton, the painting showed the three women
sitting in a garden. In the corner of the garden was "a little fountain, and in the fountain there
was a little tiny medallion that was the face of Steve Beard." Appellant told Tarlton "they had
it included in the painting because they didn't want to hurt his feelings" and "they could just paint
over it when he died."

The trial court overruled appellant's rule 404(b) objection to this testimony on the
ground that it was relevant to show motive. This ruling was within the scope of the court's
discretion. The court also did not abuse its discretion by concluding that the probative value of
the evidence outweighed the danger of unfair prejudice. Point of error eighteen is overruled.


Suicide pact

Doose and Grimm testified that they, together with Kristina and Jennifer, were
present when appellant had an emotional breakdown about two weeks after Beard died. They said
that appellant was upset by the rumors that she was involved in Beard's death. She told them that
she wanted to kill herself, but "didn't want to die alone and she wanted all of us to commit suicide
with her." The young people tried to calm appellant and change the subject.

The court ruled that this testimony was relevant to show appellant's consciousness
of guilt and that its probative value outweighed any unfair prejudice. We find the question to be
close, but conclude that the trial court did not abuse its discretion in this ruling. We also note that
the evidence can be viewed as favorable to the defense, in that it shows appellant as being so
distraught by her husband's recent death and the resulting rumors as to contemplate the suicide
of herself and her daughters. Point of error twenty is overruled.


Comment regarding bank

The trust holding the bulk of Beard's assets was managed by a Dallas bank. About
a week after Beard's funeral, appellant went to Dallas to speak to bank officials. Goodson
testified that upon her return, appellant told her that the bank was going to put her on a budget
and limit her withdrawals from the trust. According to Goodson, appellant said she told the
bankers, "Do you remember how you used to kiss my husband's ass? Well, you're going to have
to learn to lick my asshole."

Appellant's reaction to the bank's proposal was relevant to the question of her
motive. Although the remark was crude, the trial court did not abuse its discretion by concluding
that the probative value of the testimony outweighed any unfair prejudice. Point of error twenty-one is overruled.


Dating

Goodson testified that appellant began dating soon after Beard's death and saw
several men socially, both in Austin and in Houston. The substance of this testimony was
summarized earlier in this opinion. Appellant complains that the evidence was intended merely
to suggest that appellant was immoral and thus more likely to be guilty.

The testimony describing appellant's active social life weeks after Beard's death,
like the other evidence of appellant's good spirits at that time, tended to show appellant's attitude
toward Beard and her motive for being involved in his death. The testimony tended to connect
appellant to the offense and thus corroborated Tarlton's testimony. The evidence also tended to
rebut the defensive theory that appellant, like Beard, was a victim of Tarlton's obsessive behavior. 
The admission of this testimony was not an abuse of discretion. Point of error twenty-two is
overruled.


Sexual advance

Goodson testified that during the trip to Houston for the rodeo, she and appellant
were in their hotel room when appellant made the comment that Goodson had large breasts. 
Goodson said that she responded by saying, "Yeah, you know, they're real." Goodson continued,
"And then she ripped her shirt open and showed me hers and asked me did I want to feel them,
and I said no."

The State defends the admission of this testimony by arguing that it rebutted the
defensive theory that Tarlton was an unstable woman who attempted to entice appellant into a
lesbian relationship, who misconstrued appellant's friendship as romantic love, and who killed
Beard in the delusional belief that he was standing in the way of her relationship with appellant. 
Evidence that appellant made a sexual advance toward Goodson, urges the State, tended to
corroborate Tarlton's description of her relationship with appellant as one of mutual sexual
attraction. 

While this testimony may have been marginally relevant, it nevertheless had a
strong potential to impress the jury in an irrational, emotional way. But given the brevity of the
testimony and the volume of other admissible evidence, we are persuaded that any error in the
admission of this testimony over appellant's rule 403 objection was harmless. See Tex. R. App.
P. 44.2(b). Point of error twenty-three is overruled.


Katina Lofton



Katina Lofton was called as a defense witness to testify regarding statements
Tarlton made to her while both women were incarcerated in the county jail. Appellant contends
that the trial court violated her due process rights by threatening Lofton with perjury charges prior
to her testimony. She also contends that the court erred by refusing to admit evidence of Lofton's
prior consistent statement to rebut the State's claim of recent fabrication.


Perjury admonishment

Lofton was scheduled to be the first witness of the day. Before the jury was seated,
the court called Lofton forward and told her, "I'm pretty concerned because I've read right here
what you told the Defense, right here, everything you told them, and I have right here what you
told the State. I'm pretty angry." Lofton indicated that she did not understand the basis for the
court's anger. The court told her, "I'm angry because I'm seeing two different stories that you've
told the State and what you've told the Defense." The court told Lofton, "[W]e're not playing
games in here," and warned her, "I just want to let you know that you do have to tell the truth
and that if you don't tell the truth that you are subject to being charged with perjury. Okay? 
Aggravated perjury." The court told Lofton that with her record, she could receive twenty years
in prison if she testified untruthfully. The entire colloquy between the court and Lofton consumes
six pages in the record. (4)

Lofton was briefly removed from the courtroom. Defense counsel objected, "I
think you came down on this witness, you intimidated the witness . . . ." The court responded,
"When I know that somebody is going to come in here and lie, I need to read them the riot act
and let them know that whatever they've told in the past they need to get up here and tell the
truth, and I'm going to have her swear on the Bible. Not before the jury."

After Lofton was returned and sworn, and after the jury was seated, the court
instructed defense counsel to call his next witness. Counsel called one of the defense medical
experts. Out of the jury's hearing, the court told counsel that "[Lofton] is the first one on your
list, and you are going to call her. She's listed. Now, call her and sit down and start." Counsel
asked if he was being ordered to call Lofton, and the court said that he was. Counsel indicated
that he would follow the court's order, but that he was no longer sure whether he wanted to call
Lofton because "the Court has intimidated this witness." After counsel made it clear that he
would call Lofton to the stand only if ordered to do so and that he did not intend to ask her any
questions without first talking to her, the court ordered Lofton returned to jail. The court
admonished defense counsel that he was not to speak to Lofton, adding, "She's not to have any
contact with anybody, we'll just hold on to her, until this matter is resolved. . . . She is not to
have any contact with anyone until I give--say she can." Later that morning, during a bench
conference, the court told counsel for both parties that "Lofton will be available for either of you
to talk to during the lunch hour. I would be careful, you know, just to make sure that she knows
she needs to tell the truth. That's all I want. I don't care what the truth is."

Appellant contends that her due process rights were violated by the trial court's
remarks to Lofton. U.S. Const. amends. V, XIV; Tex. Const. art. I, § 10. (5) She relies on the
opinion in Webb v. Texas, 409 U.S. 95 (1972). In Webb, the trial court, on its own initiative,
admonished the only defense witness, a prison inmate, "If you take the witness stand and lie under
oath, the Court will personally see that your case goes to the grand jury and you will be indicted
for perjury." The court added that it was likely that any punishment the witness received for
perjury would be cumulated with his current sentence. Id. at 96. After this admonishment, the
witness declined to testify. The Supreme Court held that "the judge's threatening remarks,
directed alone at the single witness for the defense, effectively drove that witness off the stand,
and thus deprived the petitioner of due process of law under the Fourteenth Amendment." Id. at
98.

This Court has written that it is not inherently improper for a trial judge to advise
a prospective witness of the penalties for perjury. Davis v. State, 831 S.W.2d 426, 437 (Tex.
App.--Austin 1992, pet. ref'd). On the other hand, warnings concerning the dangers of perjury
cannot be emphasized to the point where they threaten and intimidate the witness into refusing to
testify. Id. at 438. Although "there is no bright line of demarcation between proper and
improper perjury warnings," id., the trial court's admonishments to Lofton arguably crossed that
line.

Lofton did not, however, decline to testify after receiving the court's
admonishment. To the contrary, Lofton took the stand later that day. Lofton testified that during
their jail conversations, Tarlton never told her that appellant had asked her to shoot Beard. 
Instead, Tarlton told Lofton that she shot Beard because he never cared for her. According to
Lofton, Tarlton said that she called the Beard house immediately after the shooting and asked
appellant to retrieve the shotgun shell. Tarlton told Lofton that appellant "was hysterical and just
hung up." Lofton testified that Tarlton told her that she had made up the story about appellant
manipulating her and that she was going to lie about appellant in order to get a twenty-year
sentence. Tarlton told Lofton that she loved appellant but appellant did not love her, and that
appellant "wasn't going to live happily ever after while she rot[s] in jail."

Appellant argues that even though Lofton testified, her due process rights were
violated because the court ordered Lofton to testify and because the court's admonishments might
have caused Lofton to shade her testimony or withhold testimony favorable to appellant. We are
not referred to any place in the record where the trial court ordered Lofton to testify, nor do we
find any other indication in the record that Lofton's decision to testify was involuntary. 
Moreover, there is no evidence that Lofton's testimony was altered in any way by the court's
admonishment. In January 2003, two months before appellant's trial began, Lofton gave a
recorded, sworn statement to defense counsel. This statement, which is the subject of appellant's
next point of error, appears in the record as court's exhibit fifteen. We have compared this
statement to Lofton's trial testimony, and find no material differences. Indeed, the trial record
indicates that defense counsel used the statement as a template for his questioning. We hold that
the trial court's perjury admonishment did not violate appellant's due process rights because it had
no effect on Lofton's trial testimony. Point of error twenty-four is overruled.


Prior consistent statement

During Lofton's cross-examination, she acknowledged making statements to a
prosecutor that were inconsistent with some of her trial testimony. Lofton also testified that she
had met appellant in jail and maintained a correspondence with her. In one of Lofton's letters to
appellant, she told her "there is no limit to what I wouldn't do for you." Lofton asked appellant
for several favors, including money, support letters for her parole hearing, and legal assistance. 
Lofton admitted receiving $200 from appellant during the summer of 2002, about one year before
appellant's trial began. Appellant had also given Lofton a gift of stationery and envelopes, and
a friend of appellant had put $50 in Lofton's prison commissary account.

Following this cross-examination, appellant sought to introduce the transcribed
statement Lofton gave to defense counsel in January 2003. The State's hearsay objection was
sustained. Appellant argues that the statement was not hearsay because it was consistent with
Lofton's trial testimony and was offered to rebut the charge of recent fabrication. See Tex. R.
Evid. 801(e)(1)(B). But to be admissible under this rule, the prior consistent statement must have
been made before the alleged motive to fabricate arose. Haughton v. State, 805 S.W.2d 405, 408
(Tex. Crim. App. 1990). A consistent statement made after the motive to fabricate arose does
not rebut the charge. Id. The record shows that Lofton's motive to fabricate arose in the summer
of 2002, when appellant gave her $200 dollars and Lofton began writing letters to appellant asking
for favors. Because Lofton's January 2003 statement was made after the motive to fabricate
arose, it did not rehabilitate Lofton and was not admissible under rule 801(e)(1)(B). Point of error
twenty-five is overruled.


Confrontation Issues


Appellant contends that her right to confront the witnesses against her was violated
by rulings limiting her cross-examination of Tarlton and excluding evidence regarding Tarlton's
relationship with a woman named Zan Ray. Appellant makes the same arguments with respect
to Tarlton's encounter with a man named Reginald Breaux.

A criminal defendant is constitutionally entitled to confront the witnesses against
her. U.S. Const. amend. VI, XIV; Tex. Const. art. I, § 10. As part of this right, a defendant
must be given great latitude to show any fact that might tend to affect a witness's credibility,
including ill feeling, bias, or motive. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986);
Carroll v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). At the same time, a trial court
has discretion with respect to the extent of cross-examination and the admission of evidence
generally, and its decision will not be disturbed absent a clear abuse of discretion. Cantu v. State,
939 S.W.2d 627, 635 (Tex. Crim. App. 1997). (6)


Background

Tarlton had a relationship with Zan Ray before she met appellant. Outside the
jury's presence, Ray testified that she was Tarlton's Alcoholics Anonymous sponsor. When Ray's
husband committed suicide, Tarlton was very supportive and the two women soon began a
romantic relationship. Ray said that she had never before had a sexual relationship with a woman,
and she described her relationship with Tarlton as "trauma bonding." Ray said that the
relationship ended about one year after it began when Tarlton resumed drinking and was arrested
for assault. The trial court did not permit Ray to testify before the jury, and appellant complains
that the court also refused to permit her to cross-examine Tarlton concerning her relationship with
Ray.

Reginald Breaux was the man Tarlton allegedly assaulted. Breaux testified outside
the jury's presence that on September 16, 1998, he was standing in front of a convenience store
waiting for a bus when Tarlton stopped and offered him a ride in her car, which he accepted. 
Breaux said that Tarlton appeared to have been drinking. She gave him money to purchase a six-pack of beer at the convenience store. They then drove around drinking the beer. Eventually,
they returned to the convenience store and Tarlton parked. Breaux said that Tarlton then took an
open knife from her pocket. He took the knife from her and she began to curse him. Breaux got
out of the car and, as he walked toward the store, Tarlton struck him with her car, leaving him
with a deep thigh bruise but no serious injury. When cross-examined by the State, Breaux
admitted that he did not tell the police officers who investigated this incident that Tarlton had been
armed with a knife. He also acknowledged having several convictions for burglary of a vehicle,
unauthorized use of a vehicle, possession of cocaine, theft by check, and assault.

Tarlton also described this incident outside the jury's presence. According to her,
Breaux became belligerent when she returned to the convenience store and told him that he had
to get out of the car. As he walked away, Breaux said something she did not understand and then
threw a beer can at her car. When Tarlton tried to drive away, Breaux jumped in front of her car
and was struck. 

It was undisputed that Tarlton was arrested for assaulting Breaux, but the charge
was later dismissed. The trial court did not permit Breaux to testify before the jury and did not
allow appellant to cross-examine Tarlton about this incident. 

Appellant called three experts to testify regarding Tarlton's mental status: Susan
Millholland, a counselor who conducted individual therapy sessions with Tarlton while she was
at Timberlawn in March 1999; Dr. Howard Miller, a psychiatrist who was Tarlton's attending
physician at Timberlawn; and Dr. Jerome Brown, a clinical psychologist who had studied
Tarlton's medical records dating from September 1998 but had never treated her. These witnesses
were permitted to testify to their professional assessments of Tarlton's mental health, but appellant
was not allowed to question them about statements Tarlton made to them regarding the Breaux
incident. Appellant was also not allowed to question Dr. Richard Coons, a psychiatrist called by
the State, about this incident.


Discussion

It was undisputed that Tarlton's renewed drinking and her assault arrest led her to
enter St. David's Pavilion in the fall of 1998, where she later met appellant. Appellant argues that
the trial court abused its discretion by refusing to allow her to cross-examine Tarlton and the
mental health witnesses about the reasons she committed herself to St. David's, or to offer Ray's
and Breaux's proffered testimony about this subject. Appellant relies on the opinion in Virts v.
State, 739 S.W.2d 25, 30 (Tex. Crim. App. 1987), in which the court held that a defendant
should have been permitted to cross-examine an accomplice witness regarding the witness's
history of psychiatric problems. The court was of the opinion that the excluded cross-examination
might have aided the jury's consideration of the accomplice's credibility. Id.

This cause is readily distinguishable from Virts. Appellant's cross-examination of
Tarlton consumes over three hundred pages of the reporter's record, and much of it concerned
Tarlton's psychiatric history. By this cross-examination and through the testimony of the defense
experts mentioned above, appellant was able to show that in late 1998 and early 1999 Tarlton was
clinically depressed, suicidal, and delusional. Millholland testified that Tarlton was difficult to
work with because she was untruthful at counseling sessions. Millholland also testified that after
appellant and Tarlton were given separate rooms at Timberlawn, Tarlton told her that this problem
"would be solved if certain people met with untimely deaths." Miller testified that Tarlton was
suffering from bipolar disorder and had a delusional belief that Beard "was the bad guy who was
pulling Celeste away from her and making trouble in Tracey's life." Brown testified that his
review of the medical records led him to conclude that Tarlton had a "pathological obsessive
attachment" to appellant. He agreed with Miller's diagnosis of bipolar psychosis.

This brief summary of the expert testimony demonstrates that appellant was given
a full opportunity to offer evidence regarding the mental-health issues relevant to Tarlton's
credibility as a witness. Furthermore, and contrary to the specific complaints made in appellant's
brief, the trial court did not deny her the opportunity to cross-examine Tarlton regarding her
relationship with Ray as it related to her admission to St. David's. The court ruled, "I will allow
you to ask if she went into St. David's because of the breakup of her relationship with Zan Ray." 
The court also allowed appellant to cross-examine Tarlton regarding her alleged "recruitment"
of Ray into a lesbian relationship. Tarlton denied this, but she acknowledged that she had a
history of entering relationships with married women that ultimately failed. Although appellant
was not allowed to cross-examine Tarlton regarding the details of her relationship with Ray, and
the court also refused to admit Ray's proffered testimony summarized above, appellant's brief
does not specifically address these rulings, and she offers no argument that they were an abuse
of discretion. Point of error twenty-six is overruled.

We also find no abuse of discretion in the trial court's refusal to permit evidence
of the Breaux incident. With an exception not applicable here, the credibility of a witness may
not be impeached by proof of specific instances of conduct. Tex. R. Evid. 608(b). With regard
to appellant's broader argument that she was entitled to show why Tarlton entered St. David's in
1998, the record shows that the jury was fully aware of Tarlton's psychiatric history and of her
diagnosis in 1998. The details of the Breaux incident were, in themselves, of little or no
relevance to any material issue in the case, and the trial court could reasonably conclude that any
probative value of the evidence was outweighed by the danger of undue delay and confusion of
the issues. Tex. R. Evid. 403. Point of error twenty-seven is overruled.


Deposition


Appellant urges that the trial court erred by permitting the State to introduce in
evidence a videotaped deposition she gave in a civil suit filed by Beard's three children after his
death. The children asserted that appellant was responsible for Beard's death and sought a
temporary injunction to prevent appellant from wasting the assets of Beard's estate. Appellant
was deposed by counsel for the plaintiffs in August 2000. Two months later, the case was non-suited and the cause was dismissed.

Evidence rule 804 provides exceptions to the hearsay rule when the declarant is
unavailable to testify. Tex. R. Evid. 804. One of the exceptions is for the testimony of a witness
at another hearing of the same or a different proceeding. Id. rule 804(b)(1). In a criminal case,
the party against whom the testimony is offered must have had an opportunity and similar motive
to develop the testimony by direct, cross, or redirect examination at the prior hearing. Id. The
rule further provides that the use of depositions in criminal cases is controlled by chapter 39 of
the code of criminal procedure. Id.; see Tex. Code Crim. Proc. Ann. arts. 39.01-.14 (West 2005
& Supp. 2005).

Chapter 39 has detailed provisions governing when and how a deposition may be
taken in a criminal case. See Tex. Code Crim. Proc. Ann. arts. 39.01, .02 (West Supp. 2005),
art. 39.03 (West 2005). It has been held that, unless the requirements of chapter 39 were
complied with, a civil deposition is inadmissible in a criminal prosecution. State v. Roberts, 909
S.W.2d 110, 114 (Tex. App.--Houston [14th Dist.] 1995), vacated on other grounds, 940
S.W.2d 655, 660 (Tex. Crim. App. 1996). (7) Appellant contends that the deposition she gave in
the civil suit was inadmissible under rule 804(b)(1) because it was not taken in compliance with
the requirements of chapter 39. She also contends that she was not shown to have had the same
motive and opportunity to develop the testimony at the deposition.

There is no question that appellant's civil deposition was not taken in compliance
with chapter 39. As another court of appeals has explained, however, chapter 39 applies to the
use of civil depositions in criminal proceedings only through rule 804(b)(1). Kemmerer v. State,
113 S.W.3d 513, 518 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd). Rule 804(b)(1) creates
an exception to the hearsay rule and has no application if the declarant's out-of-court statement
is not hearsay. Id. A statement is not hearsay if it is offered against a party and is the party's
own statement. Tex. R. Evid. 801(e)(2)(A). Because appellant's civil deposition was not hearsay
when offered against her, rule 804(b)(1) was inapplicable and any noncompliance with the rule,
including the incorporated requirements of chapter 39, was irrelevant. Kemmerer, 113 S.W.3d
at 517-18. Point of error twenty-eight is overruled.


Summaries of Telephone Records


The billing records for eleven cell phone numbers, all billed to either Beard or
Tarlton, were introduced in evidence as State exhibit 185. These records documented thousands
of calls made between May 1999 and July 2000. Annetta Black, a forensic analyst employed by
the State, prepared six spreadsheets summarizing these records, which were introduced in
evidence as State exhibits 179 through 184. Exhibits 179 and 180 show all of the calls made to
or from the billed numbers. Exhibits 181 through 184 show only calls between phones associated
with Tarlton and appellant. The spreadsheets were introduced pursuant to evidence rule 1006,
which provides that the contents of voluminous writings, otherwise admissible, that cannot
conveniently be examined in court may be presented in the form of a chart or summary. Tex. R.
Evid. 1006. 

There is no dispute that the requisites of rule 1006 were facially satisfied: the phone
records were voluminous, admissible, and made available to appellant for examination and
copying. Nevertheless, appellant contends that rule 1006 was misused in this cause because the
spreadsheets did not accurately summarize the actual billing records and contained additional,
unsupported material that was no more than the State's view of the case masquerading as
evidence. She further argues that because of the misleading nature of the spreadsheets, their
admission violated rule 403. Appellant relies on the opinion in Wheatfall v. State, 882 S.W.2d
829, 839 (Tex. Crim. App. 1994). In that case, the State introduced a purported summary of the
defendant's violent criminal history for which there was no supporting documentation. Id. at 838
& 839 n.10. The court of criminal appeals held that rule 1006 does not permit the State to
"summarize [its] case on legal paper and submit those documents to the trial court as 'evidence.'"
Id. at 839.

Appellant asserts that the spreadsheets were inaccurate and misleading in three
respects: they showed calls made to land line numbers for which the State did not have billing
records, they showed calls between the cell phones that were not reflected in the billing records,
and they identified certain phone numbers as belonging to persons who were not named in the
billing records. We will first describe the spreadsheets in greater detail, then address each of the
alleged inaccuracies.

Each spreadsheet has a column for each of the eleven cell phone numbers for which
there were billing records. At the top of each column is the telephone number and a name linking
the number to either appellant, Tarlton, Beard, Kristina, or Jennifer. The billing records reflect
that two of the cell phone numbers were billed to Tarlton. On the spreadsheets, however,
Tarlton's name is linked to only one of these numbers. The other number is identified as being
for appellant. The other nine cell phone numbers were billed to Beard, but in the spreadsheets
his name is attached to only one of the numbers. Of the other numbers billed to Beard, four are
identified as belonging to appellant, two are linked to Kristina, and two are shown to be
Jennifer's. Each spreadsheet also has five additional columns for five land line phone numbers
for which the State did not have billing records. One of these numbers is identified as being
Tarlton's home number, two as being Tarlton's work numbers, and two as being the Beard home
phone numbers. Each line in the spreadsheets shows an incoming call to or outgoing call from
one of the sixteen phone numbers, with its date, time, and duration. When a call was made from
one number on the spreadsheet to another, the line shows both the outgoing call from the first
number and the corresponding incoming call to the second number.

We first address the five land lines. Black testified that although she did not have
the land line billing records, each call shown being made to one of the land lines was documented
in the cell phone billing records. (8) In other words, the billing records for one of the cell phones
showed that the phone had been used to make a call to one of the land line numbers. Our
examination of the spreadsheets confirms that for every call shown as being made to a land line,
there is a corresponding call made from a cell phone. Thus, although the State did not have the
land line billing records, the spreadsheets accurately summarize cell phone billing records
reflecting calls to the land lines.

Appellant's second complaint has to do with calls made between two of the billed
cell phone numbers. Appellant has identified a relatively small number of instances (but she
claims there could be more) where the spreadsheets show that a call was made between two
phones, but the call is documented in the billing records for only one of the phones. For example,
the spreadsheet shows that a call was made from cell phone A to cell phone B, the billing records
for cell phone A confirm that the call was made to cell phone B, but the billing records for cell
phone B do not reflect the receipt of the call. Black acknowledged this anomaly in the billing
records and could not explain it. Nevertheless, Black insisted that there is a billing record for
every call shown in the spreadsheets, and appellant makes no showing to the contrary. The
anomaly identified by appellant goes to the accuracy of the billing records themselves--an issue
that is not before us--rather than to the accuracy of the spreadsheet summaries of the billing
records. 

Appellant's final complaint regarding the spreadsheets concerns the names
associated with the various phone numbers. Tarlton identified the three land lines shown in the
spreadsheets as her home and work numbers. She also testified that one of the cell phone
numbers billed to her, and identified in the spreadsheets as being her number, was the phone she
regularly used. Tarlton testified that the other cell phone billed to her was purchased in January
2000 after appellant's daughters changed all of the Beard telephone numbers. She testified that
this phone, which is identified in the spreadsheets as being used by appellant, was kept by
appellant and used by her to call Tarlton. Consistent with this testimony, the spreadsheets show
no activity for this phone number until January 2000. Other testimony shows that this was the
so-called "secret" cell phone discovered in appellant's car on the day Beard died and later seen
in appellant's possession.

Jennifer and Kristina identified the two land line numbers shown in the spreadsheets
as the Beard home phones. They also testified that, as shown in the spreadsheets, one of the cell
phone numbers billed to Beard was his car phone, one was appellant's car phone, two were
appellant's primary cell phone (before and after the number was changed), two were Jennifer's
cell phone (before and after the number was changed), and two were Kristina's cell phone (before
and after the number was changed). They acknowledged that the members of the Beard household
sometimes used each other's cell phones.

The last cell phone number billed to Beard, shown in the spreadsheets as being used
by appellant, was not identified by any witness. The exhibits reflect no activity for this number
until April 2000, well after the critical time period in this cause. Obviously, this phone could not
have been used by Beard, who died in January 2000. Neither Jennifer nor Kristina could identify
the number, from which it can be inferred that neither of them used the phone. This inference
is also supported by evidence that by April 2000, the twins were estranged from appellant and no
longer lived or communicated with her. The circumstantial evidence therefore supports the
identification of this number with appellant.

Contrary to appellant's argument, the identification of the various telephone
numbers with a particular person in the spreadsheets was not merely the State's interpretation of
the billing records. Instead, there is evidence linking each telephone number to the person
identified. This distinguishes this cause from Wheatfall, where there was no testimony to support
the purported summaries. 882 S.W.2d at 838. Although this supporting evidence was outside
the summarized telephone records, we do not believe that this rendered the spreadsheets
inadmissible under rule 1006. See Rodriguez v. State, 90 S.W.3d 340, 373-74 (Tex. App.--El
Paso 2001, pet. ref'd) (inclusion of certain conclusions and characterizations did not render record
summaries inadmissible).

The trial court's admission of exhibits 179 through 184 has not been shown to be
an abuse of discretion. Points of error twenty-nine through thirty-five are overruled.


Double Jeopardy


Appellant contends that her convictions for both capital murder and injury to an
elderly person constitute double jeopardy. See U.S. Const. amends. V, XIV. The Fifth
Amendment guarantee against double jeopardy is enforceable against the states through the
Fourteenth Amendment. Benton v. Maryland, 395 U.S. 874, 787 (1969). That guarantee protects
against a second prosecution for the same offense after a conviction or an acquittal, and against
multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969). 
It is the latter protection that is asserted here. Although appellant also cites the double jeopardy
clause of the Texas Constitution, she does not argue that the protection it affords differs from that
afforded by the United States Constitution. See Tex. Const. art. I, § 10.

Appellant raised the double jeopardy issue in the trial court after the jury's guilty
verdicts were returned but before the punishment phase began. Appellant urged that judgments
could not constitutionally be entered for both offenses and asked the court to require the State to
elect. The State contends that appellant's objection came too late and that the double jeopardy
issue was not preserved for appeal.

A double jeopardy violation may be raised for the first time on appeal if the
violation is clearly apparent on the face of the record and when enforcement of the usual rules of
procedural default would serve no legitimate state interests. Gonzalez v. State, 8 S.W.3d 640,
643 (Tex. Crim. App. 2000). Because it is undisputed that appellant's two convictions are based
on the same conduct, if there is a double jeopardy violation it is apparent on the face of the
record. And because both convictions arise out of the same trial, enforcement of the usual rules
of procedural default would serve no legitimate state interest. Honeycutt v. State, 82 S.W.3d 545,
547 (Tex. App.--San Antonio 2002, pet. ref'd). The State argues that if appellant had raised the
issue earlier, the punishment phase of trial might have been unnecessary, thus saving judicial
resources. But this argument has no merit because appellant's objection came before the
punishment phase began. We conclude that the alleged double jeopardy violation is properly
before us.

The Double Jeopardy Clause does not impose a limitation on the legislative
prerogative to prescribe the scope of punishment. Missouri v. Hunter, 459 U.S. 359, 368 (1983);
Ex parte Kopecky, 821 S.W.2d 957, 958-59 (Tex. Crim. App. 1992). A defendant suffers
multiple punishments in violation of the Fifth Amendment only when she is convicted of more
offenses than the legislature intended. Ex parte Ervin, 991 S.W.2d 804, 807 (Tex. Crim. App.
1999). When a legislature specifically authorizes multiple punishments under two statutes, even
if those two statutes proscribe the "same" conduct, "a court's task of statutory construction is at
an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment
under such statutes in a single trial." Hunter, 459 U.S. at 368-69. 

Penal code section 22.04, defining the offense of injury to an elderly person,
provides:


A person who is subject to prosecution under both this section and another
section of this code may be prosecuted under either or both sections. Section 3.04
[mandatory severance] does not apply to criminal episodes prosecuted under both
this section and another section of this code. If a criminal episode is prosecuted
under both this section and another section of this code and sentences are assessed
for convictions under both sections, the sentences shall run concurrently.



Tex. Pen. Code Ann. § 22.04(h) (West Supp. 2005). This statute plainly authorizes multiple
punishments when a defendant's conduct violates both section 22.04 and another penal code
section. See Gonzalez, 8 S.W.3d at 641 n.4. Point of error thirty-six is overruled.


Conclusion


Having overruled all of appellant's points of error, we affirm the judgments of
conviction.



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed

Filed: March 23, 2006

Publish


















* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. Appellant's initial appellate brief contained three points of error challenging the trial court's
determination that she was not indigent and refusal to order the preparation of a free record. These
issues became moot when other arrangements for payment were made. After the record was filed,
appellant filed the brief raising the points we address in this opinion.
2. Appellant asserted other grounds for quashing the indictment, but she does not assert these
other grounds on appeal.
3. Appellant also cites Lindsay v. State, in which the defendant was indicted for conspiring to
commit capital murder for remuneration. 588 S.W.2d 570, 571 (Tex. Crim. App. 1979). The court
held that the indictment did not give the defendant adequate notice of the conduct she allegedly
committed pursuant to the conspiracy. Id. at 572. The adequacy of the remuneration allegation was
not at issue, and thus the opinion is not on point in the instant cause.
4. At oral argument, appellant asked permission to submit for the Court's consideration a video
recording of the exchange between the trial court and Lofton excerpted from the television coverage
of appellant's trial. Appellant subsequently tendered a DVD containing the recording. We decline
to consider the recording over the State's objection because it is not part of the official record and
because the reporter's record is adequate for our consideration of this point of error. See Wright v.
State, 178 S.W.3d 905, 917 (Tex. App.--Houston [14th Dist.] 2005, pet. filed).
5. Contrary to the State's argument, defense counsel's objection that the court was intimidating
Lofton was sufficient to preserve this contention for appeal.
6. Although appellant did not expressly refer to the Sixth Amendment, we believe that the
arguments advanced during her many attempts to introduce this evidence were sufficient to make
the trial court aware of her complaint. See Tex. R. App. P. 33.1(a)(1)(A). We decline the State's
invitation to dispose of these issues on the ground that they were not preserved for review.
7. The court of criminal appeals vacated the judgment of the court of appeals on the ground that
the State was not entitled to appeal the order excluding the deposition. State v. Roberts, 940 S.W.2d
655, 660 (Tex. Crim. App. 1996). The court later reconsidered the scope of the State's right of
appeal and overruled its holding in Roberts. State v. Medrano, 67 S.W.3d 892, 901 (Tex. Crim.
App. 2002).
8. There are no entries in the spreadsheets for calls from a land line number to a cell phone
number.