# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00275-CR

**Kathryn Nellie Briggs a/k/a Katie Briggs, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT NO. 64754, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is one of three appeals arising from a capital murder trial against three co-defendants. The jury convicted the appellant in this cause, Kathryn Nellie Briggs, of the offense of capital murder for remuneration. *See* Tex. Penal Code Ann. § 19.03(a)(3) (West Supp. 2012). The State did not seek the death penalty, and punishment was automatically assessed at life imprisonment without the possibility of parole. In three issues on appeal, Briggs asserts that the evidence is insufficient to prove that she was criminally responsible as a party to the offense, that the evidence is insufficient to prove that she committed the offense "for remuneration," and that the district court abused its discretion in denying her motion to sever her trial from the trials of her co-defendants, Kyle James Moesch and John Anthony Valdez, Jr.[1] We will affirm the judgment of conviction.

---

[1] Moesch and Valdez filed similar motions to sever, which were also denied. Both Moesch and Valdez were also convicted of capital murder. Moesch's appeal is before us as cause number 03-11-00267-CR, while Valdez's appeal is before us as cause number 03-11-00274-CR.

## BACKGROUND

The jury heard evidence that on October 14, 2008, the body of Fort Hood Staff Sergeant Ryan Sullivan was discovered in the apartment where he had lived. Dr. Reid Quinton, a medical examiner who had performed an autopsy on the body, testified that Sullivan had received approximately 34 stab wounds to his abdomen, head, and other areas of his body, including defensive stab wounds to his arms and hands and likely fatal stab wounds that punctured his neck, heart, and lungs. Quinton also testified that the level of decomposition in the body was consistent with Sullivan having been killed in the early morning hours of October 11.

The crime scene was investigated by Detective Richard Tramp of the Killeen Police Department, who secured and collected the evidence that was found at the scene. Tramp testified that there were no signs of forced entry into the apartment.[2] He also testified that based on the blood stains in the apartment and the position in which the body was found, it appeared that Sullivan had been stabbed inside the apartment and that he had died in the location where his body had been found. Another witness, Tom Bevel, a crime scene reconstruction expert for the State, testified that in his opinion, it was likely that two people had been involved in the killing, "one to help control" the victim, and "another to stab" him (although Bevel qualified his testimony by stating that he could not exclude the possibility that one person had been able to commit the killing on his own).

The State's theory at trial was that Valdez had killed Sullivan, that Moesch had assisted Valdez in the crime, and that Briggs, who had been in a past romantic relationship with Sullivan, had orchestrated the killing in order to recover proceeds from Sullivan's life insurance

---

[2] In fact, other evidence tended to show that the apartment door had been locked from the outside, which suggested to the investigating officers that whoever had murdered Sullivan had a key to the apartment.

2

policy, of which she was a named beneficiary. Because Briggs challenges the sufficiency of the evidence supporting her conviction, we summarize the evidence presented at trial in some detail.

Sullivan was originally from Grand Rapids, Michigan, where his family still lived. Upon being notified of Sullivan's death, three of his siblings, including his half-brother Ben and half-sister Bridget, made plans to fly to Killeen to get Sullivan's affairs in order. Ben testified that after their arrival, they met with Briggs at the lobby of the motel where they were staying. According to Ben, Briggs "showed a brief amount of grief. There was a little bit of crying on her part that didn't last very long." After eating lunch together, they went to Sullivan's apartment to inventory his belongings. Ben testified that he did not find any photographs in the apartment of Briggs or any indication that Briggs had once lived there.[3] When asked to describe Briggs's attitude at the apartment, Ben recounted, "It was just like she was carrying on through any other day. . . . [T]here was no . . . mourning or sense of loss there, just that it was another day." Ben added, "It was uncomfortable. It just started to build a sense of this isn't right. There's something off kilter here."

The following day, the siblings and Briggs returned to Sullivan's apartment. This time, they were accompanied by Valdez, who was introduced to Ben as a close friend of Sullivan's. Ben testified that Valdez seemed "distant . . . with me especially," and Ben did not get the impression that Valdez had been close friends with Sullivan. Ben also observed that Briggs and Valdez "obviously knew each other" and interacted with each other to such a degree that Ben believed them to be "flirting." Given that this apparent "flirting" was happening at the place where

---

[3] The record reflects that Briggs had leased the apartment in which Sullivan's body was discovered. Briggs was the sole tenant listed on the leasing contract and had made the monthly rental payments. However, there was evidence tending to show that Briggs had paid the rent with Sullivan's credit card. A credit card belonging to Sullivan that was found at the crime scene matched the credit card that had been used to pay the rent.

his brother had been murdered, Ben at first found it to be "uncomfortable" and then "nauseating." Ben was also troubled by Briggs's apparent reluctance to let go of many of Sullivan's valuable belongings, including a car that had "great sentimental value" to Sullivan. According to Ben, Briggs refused to give Ben the car until Ben got the police involved and they "pressured" her to do so. Due to Briggs's "odd" behavior, Ben spoke with police detectives prior to departing Killeen to "make sure that they looked into Katie a little bit more."

Sullivan's half-sister Bridget testified similarly regarding her interaction with Briggs. Bridget explained that she had met Briggs a few years earlier, but she had not spent much time with her before Sullivan had died. Bridget recalled that during their lunch conversation with Briggs after they had arrived in Killeen, Briggs had told Ben that she and Sullivan "were separated and she was living in Austin with friends," but "she knew in her heart that they were going to get back together." Bridget testified that she did not observe Briggs "show grief at all" and that Briggs was "very calm" and "unemotional" while they were at the apartment going through Sullivan's belongings.[4] At one point during their interaction, Briggs showed Bridget a ring. According to Bridget, Briggs told her, "This is the ring that [Sullivan] was supposed to have given me. Somebody told me that he was going to finally propose to me." Bridget did not believe Briggs. She explained, "I felt she wasn't telling the truth. It just seemed like a lie." Briggs also told Bridget that she might be pregnant with Sullivan's child, but Bridget ultimately concluded that this was not true. Bridget further testified that she later saw Briggs at Sullivan's funeral in Michigan and that she had overheard Briggs introduce herself to others as Sullivan's "fiancée." Bridget believed this to be another lie, as she had previously asked Sullivan if he was ever going to marry Briggs, and "he had always said no."

---

[4] Bridget also recalled meeting Valdez at Sullivan's apartment and testified that Valdez's behavior was "odd" and that Briggs and Valdez were "flirting" with each other.

Sullivan's mother, Dennah, provided testimony regarding the history of the romantic relationship between Sullivan and Briggs. Dennah testified that while Sullivan was serving in Iraq in 2005, he had met a woman online who had identified herself as Marisa Miller, a *Sports Illustrated* swimsuit model. When Sullivan returned home from Iraq later that year, he began to date this woman. In July 2006, Sullivan took the woman home to Michigan to meet his parents. Dennah testified that when she met "Marisa Miller," she was surprised to discover that she was "very obese," had "dyed blond hair," and was "wearing a long sleeve pink sweater and very, very tight jeans." According to Dennah, the woman continued to claim that she was Marisa Miller, but explained that she had become "very ill and had to have all different kinds of operations" that resulted in her losing "three inches in her spine," suffering "some kind of brain injury," and gaining "maybe 150 pounds." The woman also told Dennah that she "didn't want to be called by Marisa Miller any more because that was her professional model name and now she was really Kate Briggs." Dennah had looked up Marisa Miller online and, based on the fact that Briggs looked "absolutely nothing" like Miller, believed that Briggs was lying about her identity. However, Dennah and her husband chose not to confront their son about Briggs's identity because he was scheduled to return to Iraq soon and they did not want to upset him.

Sullivan returned home from his second tour of duty in Iraq in January 2008. Shortly thereafter, Sullivan and Briggs moved into an apartment together in Killeen. Dennah testified that when she had visited the couple in the spring of 2008, she was introduced to Valdez. Dennah observed that Valdez and Sullivan were friends and that Valdez also appeared to be "very" friendly with Briggs. Dennah noticed, however, that "there wasn't that much interaction" between her son and Briggs. By May 2008, Dennah testified, "Things weren't going that well. They were fighting

a lot. She was spending most of her time in Austin." By July 2008, Dennah recalled, the two had "broken up" and Sullivan had told his mother that he had no plans to get married "to anyone."

One or two days after Sullivan had been killed, Dennah received a phone call from Briggs. Dennah testified that Briggs had told her that she "can't imagine" who would have killed Sullivan but added that it "can't have been anybody from the fort." Briggs went on to tell Dennah that "maybe it was somebody from the [shooting] range" where Sullivan had last been seen before his murder. Dennah also testified that during this same conversation, Briggs had told her that other soldiers had been "teasing" Sullivan because he was "looking at a jewelry magazine" and "was thinking of getting [Briggs] a ring." Dennah found this "rather strange because Ryan was adamant they were broken up forever," and, according to Dennah, he had been dating someone else.

Finally, Briggs told Dennah about a "video will" that Sullivan had made in which he had left most of his property to her. According to Dennah, Briggs had told her that "several soldiers and several detectives had watched it, and they were so moved by it that some of them had to leave the room." Briggs mailed the video to Dennah, who watched it with her husband and then contacted the Killeen Police Department to ask them if they had seen the video. The detective with whom Dennah spoke "had no idea that there was a DVD," and she mailed it to him so that it could be used in the investigation.

The label attached to the DVD was dated "10/07/2008," which was one week before Sullivan's body was found. Included with the DVD was a note from Briggs claiming that October 7, 2008 was the date that she believed Sullivan had picked up the video from the store where it had been processed. Dennah testified that there were "several things" which led her to believe that the video was not actually made on that date, including that Sullivan looked younger on the video and less "bulked up," that Sullivan made references in the video to family members and events that

6

seemed outdated, and that he had less tattoos in the video than he had in 2008. Dennah concluded that the video must have been made during Sullivan's first deployment to Iraq or shortly thereafter.

In fact, the evidence tended to show that Dennah's suspicions about the date of the video were correct. Kathy Camat, the custodian of records for YesVideo, a company that copies videotapes, slides, and prints to DVDs, testified that YesVideo had copied the video will from a VHS tape to a DVD. According to Camat, the digital conversion had been ordered by a person named Katie Briggs on July 10, 2007, and returned to Briggs on July 24, 2007.

Documents relating to Sullivan's life-insurance policy were also admitted into evidence. The policy, which Sullivan had signed on August 28, 2006, designated Sullivan's parents and Briggs as beneficiaries. According to the policy, the parents would each receive $150,000 upon Sullivan's death, while Briggs would receive $100,000. According to Sergeant Maxwell Davis, who was friends with Sullivan and had served in the same unit with Sullivan in Iraq, Sullivan was scheduled to update his life-insurance policy in October 2008 beginning the week after he was murdered. Davis testified that Sullivan had informed him that he was planning on making changes to his policy at that time. Davis also testified that the schedule for making changes to one's life-insurance policy was not a secret and that everyone in the unit knew about it.

Lee Price, the casualty assistance officer at Fort Hood, testified that the day after Sullivan's body was discovered, Briggs had applied to receive benefits under the life-insurance policy. The application was accepted. Approximately two weeks later, on October 31, 2008, Briggs wrote two checks on the account, each in the amount of $9,500 and made payable to herself. Additional checks were written on the account in later months.

During the investigation into Sullivan's murder, Briggs talked to the police on multiple occasions and provided two written statements. In her first statement, taken on the day

7

Sullivan's body was discovered, Briggs briefly described her relationship with Sullivan and explained that she had last seen him in September 2008. However, she claimed that Sullivan had left messages for her on October 10 and October 11, 2008, asking her if they could have dinner together and talk.[5] In her second statement, taken on October 30, Briggs described in greater detail her relationship with Sullivan, explained the circumstances surrounding their break-up, and claimed that Sullivan had continued contacting her after their relationship had ended. Briggs denied being involved in Sullivan's killing or knowing who was. Briggs also claimed not to have known that she was a beneficiary in Sullivan's life-insurance policy until after Sullivan had been killed.

As the investigation into Sullivan's murder progressed, the police began to suspect that Valdez and Moesch, who had both been medics in Sullivan's Army unit, had been involved. The evidence tended to show that Moesch's DNA had been found on cigarette butts from an ashtray on a table located near Sullivan's body, Valdez's DNA had been found on three cigarette butts located on the floor of the apartment and on the mouth of an energy-drink bottle found at the scene, and DNA from both men had been found on a cigarette butt that had been recovered from inside the bottle. The bottle itself was found on top of a plate that had Sullivan's blood on it.

The lead investigator in the case was Detective Keith Drozd of the Killeen Police Department. The day after Sullivan's body was discovered, Drozd talked with Briggs over the phone. According to Drozd, Briggs had told him that Valdez was staying with her the weekend that Sullivan was killed. Drozd then asked Briggs "about a missing key" to Sullivan's apartment, and Briggs "stated that at one point there was a missing key." Drozd also asked Briggs "if Valdez had ever received a key to the residence." According to Drozd, Briggs "stated that she had never given

_____

[5] As the evidence tended to show, these dates corresponded to the weekend in which Sullivan was murdered.

him one and she didn't believe that he had ever received one." Briggs also told Drozd that Valdez and Sullivan were friends and that she "would consider them best friends."

A key witness for the State in its case against Valdez and Moesch was Jeremy Jacobs, who testified that both Valdez and Moesch had made incriminating statements to him regarding their involvement in the murder. Jacobs explained that he, Valdez, Moesch, and Sullivan had all served together in the same Army unit and that they were good friends. However, according to Jacobs, the friendship between Valdez and Sullivan eventually deteriorated. Jacobs testified that in late August 2008, the four men had met up at a bar in Austin and that while they were there, Valdez and Sullivan got into a disagreement. Sullivan left the bar "real upset," while Valdez, who, according to Jacobs, was very intoxicated, had to be "pretty much carried" out of the bar by Jacobs and Moesch. Jacobs explained that they walked Valdez to another bar down the street where, according to Jacobs, Briggs was waiting to meet up with Valdez.

Jacobs testified that at an unspecified later date around September or October 2008, Valdez had told Jacobs and Moesch "that there was a hit on [Sullivan] and that [Valdez] was going to carry it out." When asked if Valdez had said anything about "who was behind [the hit]," Jacobs testified, "At the time he said it was lawyers and government officials and something like that." Jacobs also claimed that Valdez had later told him that "[Sullivan] was pissing the wrong people off and stepping on toes." Jacobs further testified that Valdez had told him and Moesch that "he was going to go kill [Sullivan] at night," and that the people who had ordered the hit had paid Valdez $100,000 to do the job.[6] According to Jacobs, "Valdez offered us $2,000 each to help get rid of the body after he was done." Jacobs testified that both he and Moesch told Valdez, "I don't know."

---

[6] As the evidence tended to show, this amount corresponded to the amount of money that Briggs was entitled to receive under Sullivan's life-insurance policy.

9

Jacobs added that Valdez "said that we should keep quiet about it. And since we know about it, you know, something could happen to us also." When asked what his reaction was to Valdez's statements, Jacobs answered, "I honestly didn't take a threat on someone's life seriously."

Jacobs testified that later that day or the following day, he, Valdez, and Moesch went to Quantico Tactical, an arms and tactical supply shop located at Fort Hood, where "Valdez said he was looking for a stun gun . . . to incapacitate [Sullivan]." According to Jacobs, Valdez was unable to locate such a gun, and the men left the store. Jacobs added that at a later date, while he and Valdez were at Fort Polk in Louisiana training for their next deployment, they were "going through some chests and medical supplies" when Valdez asked Jacobs if he knew whether the supplies contained any "paralytic agents." Jacobs asked Valdez "what he wanted it for," and Valdez told Jacobs that "he was going to draw it up in a syringe and use that to incapacitate [Sullivan]." In response, Jacobs said nothing. Later, Valdez told Jacobs "that he went through a drug reference book and found some of the chemicals that are used in lethal injections and showed it to me in his pack." According to Jacobs, Valdez claimed "that he found two of the three chemicals used in lethal injection and he took them." Valdez did not tell Jacobs what he planned on doing with the chemicals, but Jacobs "assumed it was for the same reason he was asking for it before." Despite this and the attempt to obtain a stun gun at the weapons store, Jacobs testified that he "really still didn't take [Valdez] seriously." After returning from their training exercises, Jacobs and Valdez returned to Fort Hood. According to Jacobs, Valdez "had a fight with the company commander" on Wednesday, October 8, and Valdez did not return to work the rest of the week.

Around that same time period, Briggs was working in Austin as a file clerk for the IRS. The evidence tended to show that on Thursday, October 9, Briggs went to lunch at a cupcake shop with her co-workers Gilbert Ramirez, Margaret Mansfield, and Joy Campos. According to

10

Campos, it was Briggs's idea to go there. Ramirez, Mansfield, and Campos each testified that Briggs had told them that she was planning on meeting her "brother" at the shop so that he could return to her the key to the apartment of Briggs's boyfriend in Killeen. The co-workers each testified that while they were at the shop, a man pulled up riding a motorcycle, talked with Briggs, and handed her something. Ramirez testified specifically that the man gave Briggs a key. In court, Ramirez and Campos both identified Valdez as the man who had met with Briggs.

The next evening, Briggs and Valdez were seen together at the Austin apartment complex where Briggs lived. Sammy Gonzalez, a friend of Valdez's who lived at the same complex, testified that he had seen Valdez at approximately 6:00 p.m. and had asked Valdez if he "wanted to go out" that night. Valdez "kind of just shrugged it off," and Gonzalez "never got a direct answer." Later on, Gonzalez again asked Valdez if he wanted to go out that night. This time, Gonzalez testified, Briggs was with Valdez. According to Gonzalez, Valdez did not respond to his question, but Briggs told Gonzalez that Valdez "had something to do."

The evidence tended to show that on that same night, Sullivan was out drinking with friends in Killeen, including Moesch, and that while they were out drinking, Moesch had received text messages and phone calls from a person in Austin inquiring about Moesch's whereabouts and whether Sullivan was with Moesch. During the course of the investigation, Moesch provided three written statements to the police explaining his account of what had happened that night. In all three statements, Moesch claimed that later that night, Sullivan and Moesch had returned to Sullivan's apartment, watched a movie, continued to drink, and eventually fell asleep in the living room. In the first statement, taken the day after Sullivan's body was discovered, Moesch claimed not to remember anything after he had fallen asleep. However, in the second statement, taken on November 19, 2008, Moesch stated that he remembered waking up later that night and seeing a

11

person in the living room "wearing a black ski mask over [his] entire face." Moesch also observed that the person was "wearing black gloves with plastic knuckle protectors" that were similar to gloves that Moesch had seen "sold at the PX in Iraq." According to Moesch's statement, the person took off his ski mask and told Moesch that "we need to leave now." Moesch "looked over and saw a body over in the corner." Moesch "asked the person if [he] killed Sergeant Sullivan," and "the person walked over" to the body, "kicked the feet and said yes." Moesch "figured at this point that the body belonged to Sergeant Sullivan." Moesch "exited through the front door" with the person and asked the person to take him to Fort Hood. However, the person refused, telling Moesch that he "didn't want to be seen anywhere at that time in the morning after what had just taken place."[7]

The next morning, at approximately 7:30 a.m., Jacobs awoke to discover Moesch inside the duplex where Jacobs and Jacobs's wife, Kristi, lived.[8] Jacobs and Kristi testified that Moesch looked "scared." Jacobs testified that Moesch "was coming out of the hallway bathroom" and "looked like he had just finished washing his hands." According to Jacobs, Moesch told him, "It's done, Sully's dead." Jacobs did not believe Moesch, even after Moesch showed Jacobs what appeared to be "a couple of little drops of . . . blood on his pants leg." Jacobs drove Moesch to Fort Hood, dropped him off there, and returned home.

---

[7] A redacted version of Moesch's third statement, taken on November 23, 2008, was admitted into evidence. The redacted version did not contain much information, although it did contain the following statements: (1) "When initially approached, I offered to help in any way needed for a cut"; (2) "After we went to Quantico Tactical is when I knew a hundred percent in my mind that the person was going to kill SSG Sullivan"; and (3) "Jacobs said he could probably get some from an old gang that he used to know in Houston." The statement also contained Moesch's brief description of the August 2008 argument between Valdez and Sullivan at the bar in Austin and how Moesch and Jacobs had separated Valdez and Sullivan before the argument became physical.

[8] There was evidence tending to show that Moesch had lived in the duplex with Jacobs and Kristi from June 2008 until September 2008. Jacobs testified that after Moesch moved out of the duplex, Valdez moved in.

Later that same day, Gonzalez went with Briggs and Valdez to a bar in Austin to watch the annual football game between the University of Texas and the University of Oklahoma. Later on, Gonzalez testified, Moesch joined them at the bar. According to Gonzalez, during the game, Valdez and Moesch spent time together outside the bar, "talking and smoking." Gonzalez further testified that at some point in the next couple of days, he had received a text message from Valdez stating that the police were looking for him and asking Gonzalez to tell the police that Valdez was with him that weekend.[9]

The following Tuesday, October 14, Jacobs was told by another soldier that Sullivan had been found dead in his apartment. When Jacobs returned home that night, he asked Valdez if he had killed Sullivan. According to Jacobs, Valdez "just looked at [him] and kind of gave me a smirk." At that point, Jacobs did nothing and talked to no one, including the police. When asked why he "didn't say anything," Jacobs testified, "Because I take very seriously the threats that Valdez made against myself and Kristi." He later testified that he had felt threatened by Valdez, and he imagined that Moesch had felt similarly threatened.

At some later date, after the police had initially questioned Valdez, Jacobs "asked [Valdez] how that went." Valdez's response, according to Jacobs, was the following: "[H]e just looked at me and said they don't have anything that's ever going to stick. And I asked him again, did you do it? And his response was, 'What do you think,' and he just kind of gave me some—like a little twisted smile or a smirk." After Sullivan was killed, Jacobs testified, Valdez continued living with him and Kristi. However, Jacobs recalled, "He was there pretty much every week and gone on

---

[9] Gonzalez's testimony regarding the interaction between Valdez and Moesch during the game and the text message that he had allegedly received from Valdez was corroborated by other witnesses who had also been at the bar during the game.

the weekends." According to Jacobs, whenever Valdez would leave for the weekend, he would take his motorcycle with him.

On November 11, 2008, Jacobs decided to contact the police and "made an anonymous call to the Killeen Police Department" from a pay phone. Jacobs was informed that the detective in charge of the case was not in the office, and he decided not to leave a message. However, the call had been recorded, and the police played the recording to soldiers in Jacobs's company who were able to identify his voice. The soldiers approached Jacobs, who eventually agreed to talk to the police. Shortly thereafter, Valdez was arrested. Following his arrest, police executed a search warrant at a motel room that Valdez had rented. Among the evidence recovered from the room was $4,480 in cash found inside a Bank of America envelope. The envelope was found inside a jacket that had allegedly belonged to Valdez. The evidence tended to show that Valdez had a checking account at Bank of America.

Other evidence implicating Briggs in the murder included evidence tending to show that Briggs and Valdez had exchanged significant amounts of money following the murder. Approximately two weeks after Sullivan was killed, Detective Drozd discovered that money was being withdrawn from Sullivan's bank account. Drozd confronted Briggs about whether she was responsible for the withdrawals, but Briggs denied making any withdrawals from the account. Later, Drozd learned that on October 16, 2008, Briggs had made a flight reservation on Delta Airlines for a January 2, 2009 trip from Austin to Cincinnati. Drozd asked Briggs if she had used Sullivan's account to purchase airline tickets. Briggs stated that she had not.

Bank statements were admitted into evidence that showed activity in the bank accounts of Sullivan, Briggs, and Valdez. On September 27, 2008, Sullivan's account had a balance of $10,800. The balance at the end of October was $4,600. On October 15, 2008, the day after

14

Sullivan's body was found, the bank statement reflected a debit of $131.10 to a hotel in Austin. On October 20, the statement reflected a $510 debit to Delta Airlines.

The bank statements tended to show that in late 2008 and early 2009, Valdez maintained a low balance—near zero dollars—in his two checking accounts. However, on the occasions when Valdez did have money in his account, he would often transfer that money into Briggs's account. For example, in January 2009, Valdez received a federal tax refund of $1,973. Some of that refund was transferred directly into Briggs's account on two separate dates—$1,000 on January 30 and $400 on February 2.[10] Similar transfers occurred in late 2008.

The bank statements also tended to show that in September 2008, Briggs's saving account had a negative balance. However, in the next three months, $15,874.30 was deposited into Briggs's account. The account reflected numerous transfers from Valdez's account and also a transfer of $4,000 from her savings account to her checking account on November 13, 2008. Briggs's checking account had a balance of $7.20 on September 11, 2008, and a balance of $6.41 on October 14, 2008. On November 7, the balance in the account was $9,341.54. However, by December 11, the balance had been reduced to $1,053.19. One of the transactions during that time period was a $520.50 purchase from Delta Airlines on November 19. Another notable transaction was a $4,000 cash withdrawal from the bank on November 17.[11]

---

[10] According to Valdez's bank statement, the remaining $573 appears to have been transferred from one of Valdez's checking accounts into his other checking account. However, at trial, the custodian of bank records identified this amount as being transferred directly into Briggs's account.

[11] As noted above, $4,480 in cash had been found in a bank envelope in Valdez's jacket after he had been arrested on November 19.

After Valdez was arrested, the police discovered additional evidence tending to connect Briggs to the murder. The police learned that Valdez had claimed to his friends and others that he had a girlfriend by the name of Airianna Benitez, who he was planning to marry. However, none of Valdez's friends—with the exception of Briggs—had ever met this woman. The police eventually came to believe that "Airianna Benitez" was actually an alias used by Briggs.

Briggs was friends with Michael Peterson and his girlfriend, Kerri Keane. In 2008, as Briggs's relationship with Sullivan was ending, Briggs began living with Peterson and Keane at their Austin apartment. Peterson recalled a conversation with Keane and Briggs at the apartment in which Briggs told them that she was a beneficiary on Sullivan's life insurance policy, but he could not recall when the conversation took place. However, Keane also recalled the conversation and testified that it took place at some point before Ryan had died. According to Keane, Briggs had told them that the amount she was entitled to receive under policy was $100,000.

Peterson testified that around the time that Briggs was living with them, Valdez became a "fairly regular guest" at their apartment and that Valdez would sometimes be accompanied by Moesch. Peterson also testified that he and Keane soon learned of Valdez's relationship with "Airianna Benitez," that Valdez was planning to marry her and that, on their honeymoon, they were "going like on some exotic vacation." Peterson, who worked for Verizon, recounted a time in the summer of 2008 when Valdez approached him about purchasing cell phones for him and "Airianna." Peterson agreed to sell two phones to Valdez. The night after he sold the phones to Valdez, Peterson recalled, Briggs and Valdez were at the apartment. Peterson testified that when Valdez left the apartment, he left behind one of the phones that he had purchased. Peterson asked Briggs about the phone, and she told him that "she'd get it to Airianna." Peterson further testified that Briggs took

16

the phone and, later that night, began "playing with it," which Peterson described as "[having] it open, like setting the features up on it and stuff like that."

In early October 2008, Peterson and Keane were visiting family in Michigan. Peterson testified that when he returned home on the night of Friday, October 10, Valdez came over to their apartment, "hung out for a couple of hours," and then "took off" at approximately 11:00 p.m., allegedly to go to Sixth Street. When Peterson awoke the next morning, he found Valdez sleeping on the floor in the living room. That night, Peterson went out to Sixth Street with a group of friends, including Briggs, Valdez, and Moesch. Peterson agreed with the prosecutor's characterization of their behavior that night as "goofing around" and "stay[ing] out pretty late partying."

When Keane returned home from Michigan approximately one week later, she informed Peterson that Sullivan had been murdered. After learning of the murder, Peterson decided to use his position at Verizon to look up Valdez's phone records. He noticed that early on the morning of October 11, Valdez had made two phone calls to Moesch.

Peterson also testified that in early November 2008, he and Keane received a phone call from Moesch in which Moesch had admitted that he had been present in Sullivan's apartment when Sullivan had been killed. According to Peterson, that same month, Briggs told him that she wanted to purchase a second cell phone to talk to an "old friend" named "Katnik." Peterson sold Briggs a phone as requested, the "same exact phone" model that he had previously sold to Valdez and "Airianna." Peterson further testified that while Valdez was in the Bell County Jail following his arrest, Peterson would receive letters from Valdez addressed to him, Keane, Briggs, and "Airianna." Peterson recalled that most of Valdez's letters were addressed to Briggs.

17

Another witness, Jorge Gonzalez, who had also been with Briggs and Valdez during the Texas-Oklahoma game, testified that after Valdez was arrested, he had received a text message from a woman claiming to be the sister of "Airianna," Kelly.[12] According to Gonzalez, in the message, "Kelly" had offered to "pay off" his $3,500 student loan. Gonzalez declined the offer.

The evidence also tended to show that both Briggs and "Airianna" were placed on Valdez's list of people who were allowed to visit him at the jail. However, although jail records reflected that Briggs had visited Valdez in jail, there were no recorded visits by "Airianna." The jail records also tended to show that Briggs had deposited hundreds of dollars into Valdez's inmate account on multiple occasions.

Also admitted into evidence were telephone records from the jail tending to show that Valdez had made numerous calls while he was in jail to numbers associated with Briggs. From November 20, 2008 until February 20, 2009, Valdez called Briggs's number 29 times and the calls lasted a total of 162 minutes. From February 20, 2009 until March 2011, Valdez called Briggs 24 times and the calls lasted a total of 32 minutes. Valdez also called a number in the 512 area code a total of 51 times prior to February 20, 2009. After that date, other calls were made to the same number, but some of the calls were made by Valdez, while other calls were made by Briggs after she had been arrested in May 2009. However, none of the calls made by Briggs to that number were completed calls. Finally, the phone records reflect that 581 calls totaling 1,744 minutes were made by Valdez to a number in the 210 area code prior to February 20, 2009, and that 39 calls totaling approximately 6 minutes were made by Valdez to that same number after February 20. Many of the

---

[12] During the investigation, officers learned that Briggs had told others that "Airianna" had sisters named Rupal, Jordan, and Kelly Monaco. Officers never located Rupal or Jordan. However, they eventually learned that Kelly Monaco, similar to Marissa Miller, is a celebrity, specifically, a model and actress currently starring on the soap opera *General Hospital*.

18

calls between Valdez and Briggs were recorded and admitted into evidence, and multiple witnesses identified the voices in these calls as belonging to Valdez and Briggs.

After Valdez was arrested, data was extracted from his cell phone. The data corresponding to Valdez's contacts revealed three names and numbers of significance: (1) "Anna" with a number in the 254 area code; (2) "Sweetness" with a number in the 210 area code; and (3) "Sis" with a number that matched Briggs's cell phone number.[13] Killeen Police Detective Reese Davis, who analyzed the data, testified that there was no record of any outgoing calls from Valdez's phone between October 7 and 12, 2008, which indicated to Davis that either no calls were made during that time period or that the calls were deleted. Also admitted into evidence for the jury's consideration were self-authenticated phone records for other phones belonging to Valdez (three separate phone numbers were attributed to Valdez), Moesch, Gonzalez, Briggs, Sullivan, and Brandon Katnik.[14]

Billy Curry, an investigator with the Bell County District Attorney's Office, had attempted to locate "Airianna" during the investigation. He had first learned of "Airianna" from Jacobs, who had identified her as Valdez's fiancée. Curry testified that Jacobs had told him that he had only spoken with "Airianna" over the phone and had never met her in person. Curry learned that during the weekend of Sullivan's murder, "there was significant contact between John Valdez and the number that we had for Airianna Benitez." According to Curry, locating "Airianna" was

---

[13] There was evidence tending to show that "Anna" and "Sweetness" were nicknames of "Airianna," and "Sweetness" was also apparently a user name on a laptop computer operated by an administrator identified on the computer as "Kitty Kate." The police attributed the number in the 210 area code to "Airianna," and the phone records tended to show that the number belonged to a phone owned by Valdez.

[14] As noted above, the evidence tended to show that Briggs had purchased an additional cell phone so that she could speak with Katnik, whom she had identified as an "old friend."

difficult, because no witnesses had any contact information for her other than one cell phone number that Jacobs had provided, and Curry "could not find anyone that had actually laid eyes on Airianna Benitez." Curry had called "Airianna's" phone number on several occasions but had always been directed to voice mail, and his calls were never returned. Curry also ran the name through several state and federal databases but found no evidence that such a person even existed. All Curry could do at that point was monitor the calls that Valdez was making from the jail and hope that Valdez made a call to "Airianna" that was answered.

On January 6, 2009, such a call was made. However, it was not made to the phone number in the 210 area code that the police believed belonged to "Airianna." Instead, the call was made to a number in the 512 area code. Curry explained,

> In the jail log I observed several attempts to contact the original Airianna Benitez without success. The 210 area code number that Mike Peterson talked about, setting up that account for John Valdez. There were several attempts prior to that January 6th call that we were unable to go through, that were not completed calls. I observed and monitored the January 6th, '09 telephone call placed to the 512 area code. And in that conversation—in that conversation, there was talk between the parties on the line about . . . John Valdez not being able to make contact with that [210] number. And the person responded it's because—that she's turned it off. The DA's office is hounding her and tracking the phone, and that she turns it off, turns it on for 14 minutes at a time.

Curry believed that the person with whom Valdez spoke in that conversation was "Airianna." Concerned that "Airianna" might turn off the 512 phone number as she had turned off the 210 phone number, Curry immediately sought to obtain records associated with the 512 phone number. Once he did so, Curry learned that the phone number "did not show an address for Airianna Benitez." Instead, the number belonged to "an individual by the name of Brandon Katnik that lived in Urbandale, Iowa." Curry determined from the phone records that this phone was used

20

in Austin, Cinncinati, and Atlanta during a time period that corresponded to a flight taken by Briggs on Delta Airlines.[15] Curry also observed that activity on the Katnik phone correlated to usage patterns and locations for the cell phone in the 859 area code that was known to belong to Briggs. Additionally, Curry learned that both the "Airianna" phone number in the 210 area code and the Briggs phone number in the 859 area code were used in Copperas Cove near a location where Briggs would sometimes reside.

Briggs was arrested on May 19, 2009, after she had come home from work and had just exited her vehicle. Curry, who had assisted in Briggs's arrest, placed a call to the Katnik phone while he was standing outside Briggs's car. When he did so, one of two cell phones inside Briggs's car "lit up" with an incoming call from Curry's number. Curry testified that after Briggs was arrested, there were no further calls between Valdez and any of the phone numbers associated with "Airianna."

The State's final witness was Harris County Police Officer Dustin Deutsch, an expert in the extraction and analysis of cell-phone data. Deutsch reviewed the cell-phone data in this case and prepared an analysis of the frequency and location of calls placed by several of the cell phones associated with the defendants. Deutsch testified that on October 9 and 10, 2008, there were 61 calls between Valdez and "Airianna"; four calls between Valdez and Moesch; 14 calls between Briggs and Valdez; and two calls between Briggs and Moesch. During the same two-day period, there were

---

[15] Flight records admitted into evidence tended to show that Briggs was out of town at the time of the January 6, 2009 call. Briggs's flight reservation was for a January 2, 2009 flight from Austin to Cincinnati, returning on January 10. Briggs made the flight to Cincinnati but canceled the reservation for the return flight. Instead, Briggs flew from Cincinnati to Atlanta on January 11, missed the connecting flight to Austin, and spent the night in an Atlanta hotel.

38 text messages between Valdez and "Airianna"; two text messages between Valdez and Moesch; one text message from Briggs to Moesch; and eight text messages between Valdez and Briggs.

Deutsch testified that there was a "tremendous increase of volume of calls as well as text messages" leading up to October 11, 2008. On that date, the alleged date of the murder, there were 39 calls between Valdez and "Airianna"; 16 calls between Valdez and Moesch; 11 calls between Valdez and Briggs; and three calls between Briggs and Moesch. On that same date, Deutsch found 108 text messages between Valdez and "Airianna"; 20 text messages between Valdez and Moesch; and three text messages from Valdez to Briggs.

On October 14, 2008, the phone records revealed 30 calls between Valdez and "Airianna"; one call between Valdez and Moesch; three calls between Valdez and Briggs; and one call between Briggs and Moesch. On that same date, Deutsch found 26 text messages between Valdez and "Airianna"; 22 text messages between Valdez and Briggs; and six text messages between Moesch and Briggs. From November 17-20, 2008, the records showed 152 calls or text messages between Valdez and "Airianna" and 32 calls or text messages between Valdez and Briggs.

According to Deutsch, cell phone tower records tended to show that Valdez's cell phone was used in the vicinity of Sullivan's apartment on the morning of October 11, 2008. Three calls were made to Moesch's cell phone at approximately 3:00 a.m. and a fourth call was placed to Moesch's phone at approximately 7:25 a.m.

Similar analysis reflected that Briggs's and Katnik's phones were used in Austin on the morning of January 2, 2009, and in Cincinnati that afternoon. The Katnik phone was used several times in the Ludlow, Kentucky area the night of January 6, 2009, which, the evidence tended to show, is the city where Briggs's mother lives. Deutsch similarly traced these phones as traveling from Cincinnati to Atlanta on January 11, 2009 and then from Atlanta to Austin the next day.

22

Cell phone records further revealed that in the time period between October 7 and 14, 2008, 49 percent of the calls made from the cell phone belonging to "Airianna" used a cell tower located in an area near Briggs's residence. During that same time period, 38 percent of the calls made from Briggs's cell phone used that same cell tower. Cell phone records also showed that a call was made between Valdez and Briggs on October 9 at 12:09 p.m. near the cupcake shop where Valdez allegedly met Briggs to return the key to Sullivan's apartment. The records also reflected that Briggs's phone was used on November 19, 2008 in the vicinity of the motel where Valdez had stayed before his arrest.

Deutsch determined that on the evening of October 10, 2008, a call was placed from Briggs to Moesch at 6:48 p.m. that lasted approximately 13 minutes. Moesch then received a call from Valdez at 7:35 p.m. that lasted approximately two minutes. Moesch called Sullivan approximately two minutes later for a call lasting approximately 38 seconds. Within 10 seconds after that call, Deutsch testified, Moesch called Valdez again. Moesch then sent a text message to Briggs within a minute after the call to Valdez.

Deutsch's analysis also showed that text messages were sent from Moesch to Valdez at 4:29 a.m. and 4:57 a.m. on the morning of October 11, 2008. A text message was also sent from "Airianna" to Valdez at 6:52 a.m., and a text message was sent from Valdez to "Airianna" at 7:19 a.m. Deutsch's analysis further revealed that 22 text messages were sent or received from Briggs's phone on the afternoon of her initial meeting with the Killeen Police on October 14. According to Deutsch, the majority of these communications were with Valdez, but some were with Moesch.

The jury found Briggs guilty of capital murder as charged, and she was automatically sentenced to life imprisonment without the possibility of parole. This appeal followed.

23

## ANALYSIS

### Sufficiency of the evidence

In her first issue, Briggs asserts that the evidence is insufficient to prove that she is criminally responsible as a party to the offense. In her second issue, Briggs asserts that the evidence is insufficient to prove that she committed the murder "for remuneration."

To determine whether evidence is sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746; *Brooks*, 323 S.W.3d at 899.

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). A reviewing court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper*, 214 S.W.3d at 16-17). When the record supports conflicting inferences, a reviewing court must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper*,

24

214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id*.

Sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Johnson*, 364 S.W.3d at 294; *Malik*, 953 S.W.2d at 240.

As charged in this case, a person commits the offense of murder if she intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Murder is a capital offense if it is committed for remuneration or the promise of remuneration. *Id*. § 19.03(a)(3). Remuneration occurs when an "actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim, such as proceeds of insurance and retirement benefits." *Beets v. State*, 767 S.W.2d 711, 737 (Tex. Crim. App. 1988) (op. on reh'g). Remuneration "does not require the narrow construction requiring payment by a principal to an agent." *Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991) (en banc). Rather, the term remuneration as used in section 19.03(a)(3) "encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act." *Beets*, 767 S.W.2d at 734; *Johnson v. State*, 208 S.W.3d 478, 495 (Tex. App.—Austin 2006, pet. ref'd). "The focus is on the actor's intent or state of mind: did she kill in the expectation of receiving some financial benefit or compensation?" *Johnson*, 208 S.W.3d at 495.

Briggs was charged under the law of parties. A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id*. § 7.02(a)(2) (West 2011). Participation as a party may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Salinas v. State*, 163 S.W.3d 734, 739-40 (Tex. Crim. App. 2005); *Nzewi v. State*, 359 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

In this case, there was evidence tending to show the following:

- From the moment that Briggs first met Sullivan online, she was deceptive about her identity.

- While Sullivan and Briggs were dating, Briggs formed a close relationship with Valdez.

- Briggs was aware of Sullivan's video will leaving his property to her and of Sullivan's life-insurance policy naming her a beneficiary.

- Valdez told others that he was dating and planning to marry a woman named "Airianna Benitez," who, the jury could have reasonably inferred from phone records and other evidence, was a fictional alias of Briggs.

- The relationship between Sullivan and Briggs deteriorated around the same time that the friendship between Sullivan and Valdez deteriorated.

- In the months leading up to the murder, Valdez was a "fairly regular guest" at the Austin apartment where Briggs was staying.

- Two months prior to the murder, Valdez got into a heated argument with Sullivan at a bar in Austin and, after the argument was over, his friends took him to another bar in Austin where he was supposed to meet up with Briggs.

26

- The Thursday before the weekend in which Sullivan was killed, Valdez met with Briggs in Austin to give her a key to what co-workers described as the apartment of Briggs's boyfriend in Killeen. The jury could have reasonably inferred from this and other evidence that the key belonged to Sullivan's apartment.

- The evening of Sullivan's murder, Valdez and Briggs were together at her Austin apartment. When a friend asked Valdez if he wanted to go out that night, Briggs told the friend that Valdez had "something to do."

- The night of the murder and the morning after, Briggs exchanged numerous phone calls and text messages with Valdez and Moesch.

- The day and night after the murder, Briggs socialized with Valdez and Moesch.

- On the day when Briggs first talked to the police following Sullivan's murder, she exchanged numerous text messages with Valdez and Moesch.

- The day after Sullivan's body was discovered, Briggs applied to receive the benefits under Sullivan's insurance policy.

- When Sullivan's siblings visited Killeen following Sullivan's murder, according to their testimony, Briggs displayed only a brief amount of grief, was reluctant to give them Sullivan's personal belongings, told lies about the status of her relationship with Sullivan, and "flirted" with Valdez.

- During Sullivan's funeral, Briggs told others that she was Sullivan's fiancée. This, according to Sullivan's sister, was another lie.

- Briggs lied to Sullivan's mother about the date on which Sullivan made the video will.

- Briggs used Sullivan's bank account to purchase airline tickets and lied to the police about doing so.

- Bank statements revealed that Valdez transferred money from his checking accounts into Briggs's checking and savings accounts.

- Shortly before Valdez was arrested, Briggs withdrew $4,000 cash from her checking account. After Valdez was arrested, over $4,000 in cash was found in a bank envelope inside a jacket allegedly belonging to Valdez. Phone records tend to show that Briggs was in the vicinity of the motel where Valdez was staying and the cash was found.

27

- Shortly after Valdez was arrested for the murder of the man Briggs purported to love, Briggs visited the alleged murderer in jail.

- Valdez made and received numerous phone calls while in jail to and from phone numbers that were associated with either Briggs or her alias "Airianna."

- Briggs deposited hundreds of dollars into Valdez's inmate account while Valdez was at the jail.

Briggs asserts that the above evidence establishes, at most, that she had a bad relationship with Sullivan, that she had a secret romantic relationship with Valdez, that she was a liar, and that she used Sullivan's money and the proceeds from the life insurance policy for her own personal purposes, which included helping Valdez. According to Briggs, based on this evidence, the jury could do nothing more than speculate that she was a party to the murder.

We disagree. Briggs views the evidence in the light most favorable to her defensive theory at trial. However, we are to view the evidence in the light most favorable to the verdict and resolve any conflicting inferences in favor of the prosecution. Viewed in that light, the combined and cumulative force of all the incriminating circumstances supports a finding by the jury that Briggs was a party to the murder. The jury could have reasonably found that Briggs committed acts before, during, and after the commission of the offense that—when viewed in their totality rather than in isolation—solicited, encouraged, directed, aided, or attempted to aid Valdez and Moesch in killing Sullivan. The jury could have reasonably inferred that these acts included: giving Valdez access to Sullivan's apartment prior to the murder; telling Valdez's friend that Valdez had "something to do" on the night of the murder; calling and texting both Valdez and Moesch on the night of the murder and the morning after the murder; socializing with Valdez and Moesch the weekend of the murder so as, the jury could have reasonably inferred, to give them an alibi; providing false statements to

28

Sullivan's relatives and the police following the murder so as, the jury could have reasonably inferred, to deceive them about her involvement in the murder; remaining in contact with Valdez and Moesch following the murder, including visiting Valdez in jail; exchanging significant amounts of money with Valdez; creating a false identity, "Airianna Benitez," so as to conceal the extent of her relationship with Valdez; and purchasing and using multiple cell phones so as to conceal the extent of her involvement in the crime and her communication with the killers. Viewing this and other evidence in its totality and in the proper light, we conclude that the evidence is sufficient to support the jury's finding that Briggs was criminally responsible as a party to the offense.

The evidence is likewise sufficient to prove that Briggs committed the offense "for remuneration." Mike Peterson and Kerri Keane both testified about a conversation they had with Briggs in which she had told them that she was a beneficiary on Sullivan's life-insurance policy and would receive $100,000 upon Sullivan's death. Keane testified that this conversation occurred before Sullivan was murdered. Also, the evidence tended to show that Briggs was aware of Sullivan's video will in which he had left his property to her upon his death. Kathy Camat, the custodian of records for the store that processed the video, testified that Briggs had submitted the video to the store for conversion to DVD format in July 2007. The evidence also tended to show that the murder occurred approximately one week before Sullivan was scheduled to make changes to his will and life-insurance policy. Moreover, Sullivan's brother Ben testified that Briggs was very reluctant to part with Sullivan's personal property following his death, including Sullivan's car. Other evidence tended to show that Briggs had withdrawn money from Sullivan's checking account following his death. Additionally, the evidence tended to show that Briggs had applied for benefits under the life insurance policy the day after Sullivan's body was discovered and began writing large checks on the account in the amount of $9,500, payable to herself, approximately two weeks later.

29

The evidence also tended to show that prior to receiving the benefits under the policy, Briggs had a negative balance in her checking account and had worked as a file clerk for the IRS. Based on the combined and cumulative force of this and other evidence, the jury could have reasonably inferred that Briggs was in need of money, that she knew that she would receive money and assets upon Sullivan's death, and that she had arranged for him to be killed in the expectation that once Sullivan was dead, she would receive the proceeds of the insurance policy and the property that had been left to her in Sullivan's will.

We overrule Briggs's first and second issues.

**Motion to sever**

In her third issue, Briggs asserts that the district court abused its discretion in denying her motion to sever her trial from those of her co-defendants, Valdez and Moesch. Severance is governed by article 36.09 of the code of criminal procedure, which provides that two or more defendants may, at the discretion of the court, be tried jointly for any offense growing out of the same transaction unless, upon timely motion to sever, it is shown either that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant. Tex. Code Crim. Proc. Ann. art. 36.09 (West 2007). Briggs argues only the second ground, contending that she was prejudiced by a joint trial with Valdez and Moesch.

In drafting article 36.09, "the Legislature intended for defendants accused of the same offense to be tried together most of the time." *Qualley v. State*, 206 S.W.3d 624, 631 (Tex. Crim. App. 2006). "'Prejudice,' then, cannot mean the types of circumstances or disagreements between parties that would normally be expected to pop up during any trial containing multiple defendants.'" *Id*. Rather, "[t]o establish prejudice, the defendant must show a serious risk that a specific trial right

30

would be compromised by a joint trial, or that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence, and that the problem could not be adequately addressed by lesser curative measures, such as a limiting instruction." *Qualley v. State*, 206 S.W.3d 624, 636 (Tex. Crim. App. 2006). It is not enough for the defenses of co-defendants to be mutually exclusive or antagonistic. *See id.*

Briggs claims that she was prejudiced by Jacobs's testimony regarding the incriminating hearsay statements allegedly made to him by Valdez and Moesch, which, Briggs claims, were admissible against Valdez and Moesch as admissions by party opponents but inadmissible against Briggs. However, the vast majority of statements made by Valdez and Moesch to Jacobs did not tend to implicate Briggs in the offense.[16] In fact, Jacobs testified that he never heard anyone associate Briggs with the plot to kill Sullivan. Moreover, to the extent that statements by Valdez and Moesch could be perceived as prejudicial against Briggs, such prejudice could be adequately addressed by lesser curative measures, such as a limiting instruction. *See id.*; *see also Zafiro v. United States*, 506 U.S. 534, 539-41 (1993) (explaining that "even if there were some risk of prejudice" in a joint trial, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice"). Here, the jury was instructed that any statements made by Moesch could not be considered as evidence against Briggs or used in any way to connect Briggs to the offense. Although no such instruction was provided regarding statements made by Valdez,[17] the district court would not have abused its discretion in finding that Briggs and Valdez were

---

[16] One exception was Valdez's statement that he had been paid $100,000 to kill Sullivan. This statement had a tendency to implicate Briggs in the offense because it corresponded to the amount of money that she was scheduled to receive under Sullivan's life insurance policy.

[17] Briggs did not object to the absence of such an instruction in the charge.

conspirators to the murder at the time the statements were made and thus admitting Valdez's statements against Briggs under the co-conspirator exception to the hearsay rule. *See* Tex. R. Evid. 801(e)(2)(E); *see also Meador v. State*, 812 S.W.2d 330, 332 (Tex. Crim. App. 1991) ("[T]he co-conspirator exception to the hearsay rule is [] not limited to prosecutions for conspiracy; it is a rule of evidence applicable to any offense."). Accordingly, Valdez's statements to Jacobs would have been admissible against Briggs even if she had been tried separately.

On this record, Briggs has failed to show "a serious risk that a specific trial right would be compromised by a joint trial, or that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." *See Qualley*, 206 S.W.3d at 636. Accordingly, we cannot conclude that the district court abused its discretion in denying Briggs's motion to sever. We overrule Briggs's third issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: August 24, 2012

Do Not Publish