

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00699-CR

Paul **BUTLER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 147th District Court, Travis County, Texas
Trial Court No. D-1-DC-11-301853
Honorable Wilford Flowers, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:        Catherine Stone, Chief Justice
                Sandee Bryan Marion, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  September 11, 2013

AFFIRMED

Appellant, Paul Butler, was convicted of aggravated robbery with a deadly weapon and was sentenced to thirty-four years' incarceration.  In two issues on appeal, he asserts (1) the evidence is legally insufficient to support his conviction because the BB gun used during the robbery is not a "deadly weapon," and (2) the evidence is legally insufficient to support a conviction based upon accomplice testimony that was uncorroborated.  We affirm.

**BACKGROUND**

Farid Anwar was working as a clerk at a convenience store in east Austin when, at approximately 9:00 p.m. on March 29, 2011, two men robbed the store. A security video caught the entire incident on tape. Anwar testified two black males entered the store with a gun and "one of them pulled — cocked his gun and pointed the gun towards me, and I put my hands up." The men demanded the money and Anwar testified he complied because he "was afraid he was going to shoot me if I didn't give him the money. That's why I put my hands up." Anwar stated the men threatened him and one of the men kept saying "shoot, shoot, shoot." He testified, "I was afraid, I had my hands up and my head down, but one of them kept saying shoot, shoot, shoot." Anwar stated both men were wearing gloves and he did not get a good look at the men's faces because they were partially covered with a hood. After they took the money out of the register one of the men told Anwar to follow them and as they moved closer to the door, one of the men pushed him down and the two robbers fled.

The co-defendant, Deon Ross, testified for the prosecution. Ross testified appellant asked him to rob a particular convenience store with him because a clerk had "messed him over on some money through Food Stamps." Ross stated he and appellant decided to use BB guns to commit the robbery because they believed if they got caught, the robbery would not be considered aggravated robbery. Ross said the gun he took was a "machine looking gun" and the gun appellant took was "like a Russian gun," which he described as a handgun. Ross admitted he was the man in the video pointing the gun at Anwar, and he believed appellant had tucked his gun in the waistband of his pants while he retrieved the money.

Approximately three months after the robbery, Ross was arrested. Items connecting him to the robbery were found in his vehicle; specifically, a glove in the trunk and a backpack

containing a black ski mask, a different glove and two handguns—one of which Ross claimed was the gun used by appellant during the robbery.[1]

After Ross implicated appellant as his accomplice in the robbery, detectives went to the home of appellant's girlfriend, Jessica Parker, where appellant sometimes stayed. Parker gave the detectives permission to search her home for items related to the robbery. A pair of shoes were found that Parker said appellant wanted to dispose of because he had worn them during the robbery. Additionally, a shirt with the brand name "Coogi" on it matching the shirt seen on the video tape of the robbery was found. A jury convicted appellant of aggravated robbery with a deadly weapon and he now appeals.

## DEADLY WEAPON

In his first issue, appellant contends the evidence is legally insufficient to convict him of aggravated robbery with a deadly weapon because the BB gun used during the robbery is not a "deadly weapon" as defined by the Texas Penal Code.

The Texas Penal Code defines a "deadly weapon" as "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17) (West 2011). In order to be legally sufficient to sustain a deadly weapon finding, the evidence must show that (1) the deadly weapon meets the statutory definition; (2) the defendant used or exhibited the deadly weapon while committing the crime for which he was convicted; and (3) other people were put in actual danger. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). On appeal, appellant only contends the BB gun used does not meet the statutory definition of a deadly weapon.

---

[1] The BB gun used by Ross was seized by the police when Ross was arrested for an unrelated offense approximately a month prior to the discovery of the items in Ross's vehicle.

A BB gun is not a deadly weapon, *per se*.[2] *Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002). Rather, in offenses involving a BB gun, the State must show "that the weapon used was capable of causing serious bodily injury or death in its use or intended use." *Id*.; *see* TEX. PENAL CODE § 1.07(a)(17)(B). Whether a BB gun is loaded is not significant in a deadly weapon analysis; instead, what is significant is whether there is evidence presented that the BB gun is capable of causing serious bodily injury. *Adame*, 69 S.W.3d at 582. "With testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding." *Id*.

Here, the State introduced Christopher Leleux, a detective with the Austin Police Department, who testified about BB guns. His testimony was as follows:

Q: Detective Leleux, are you aware of BB guns causing serious bodily injury or death?
A: I am.
Q: Okay. I'm going to show you what's been previously marked as State's Exhibit Number 8 and entered into evidence and ask you if this particular gun is capable of causing serious bodily injury or death?
A: It appears to be, yes.
Q: Okay. And if I can have you further review it, is there in fact a warning on State's Exhibit Number 8 [the gun appellant used] warning that it could cause serious injury?
A: There is a warning that says, "Misuse may cause serious injury."
Q: Okay. Thank you, Detective. I'm also going to show you what's been previously admitted as State's Exhibit Number 15 [the gun Ross used] and ask you if this gun is capable of causing serious bodily injury or death.
A: I don't know if it's — if that — this one is functioning or not. It also appears if it were that it is capable of causing serious bodily injury or death.
Q: Okay. And there is a clip that was attached to it for purposes of submitting it into evidence, it was separated, but to your knowledge, regardless of whether you know this one to be functioning or not, this type of weapon can cause serious bodily injury or death?
A: It can.
Q: Now, Detective, the specific State's exhibits that I showed you, the Number 8 and the Number 15, do those BB guns shoot metal pellets?

---

[2] A BB gun "fires projectiles with energy from compressed air rather than from an explosion or burning material. Thus, it is not a 'firearm' and is not 'a deadly weapon *per se*.'" *Adame*, 69 S.W.3d at 586 (Johnson, J., concurring) (citing TEX. PENAL CODE § 46.01(3) (definition of a "firearm")).

A:     They do.

Q:     And you are also aware of cases where people have been seriously injured or killed with these types of weapons?

A:     I am.

Detective Leleux specifically testified he was aware of cases where people have been seriously injured or killed by BB guns such as the ones used by appellant and the co-defendant during the robbery. He also testified there is a warning on the BB gun itself that states "Misuse may cause serious injury." Further, Anwar testified the gun was pointed "[b]ehind [his] neck, lower neck in the back" during the robbery and he felt threatened and afraid because one of the men kept saying "shoot, shoot, shoot." The testimony presented provided information upon which the jury could reasonably find that the BB gun used was capable of causing serious bodily injury. *See Adame*, 69 S.W.3d at 582. Accordingly, we conclude the evidence was legally sufficient to support a deadly weapon finding for the offense of aggravated robbery with a deadly weapon.

## ACCOMPLICE TESTIMONY

In his second issue, appellant asserts the evidence is legally insufficient to corroborate Ross's accomplice testimony.

Texas Code of Criminal Procedure article 38.14 provides a conviction cannot stand on accomplice testimony unless it is corroborated by other evidence tending to connect the defendant with the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). In reviewing the sufficiency of corroborating evidence, we eliminate the accomplice testimony from consideration and look to the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The corroboration evidence need not be sufficient by itself to establish guilt, but need only tend to connect the defendant to the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). The corroborating evidence may be direct or

circumstantial. *Johnson v. State*, 208 S.W.3d 478, 489 (Tex. App.—Austin 2006, pet. ref'd) (citing *Cathey*, 992 S.W.2d at 462). Evidence that the defendant was in the presence of the accomplice at or near the time or place of the offense is proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997).

In addition to the accomplice testimony of Ross, the State introduced the testimony of eight witnesses including the complainant, an officer with the Austin Police Department, two detectives with the Austin Police Department, two DNA analysts, and appellant's girlfriend. Appellant's girlfriend, Parker, testified that Ross's wife, Shanelle, had told her that appellant had participated in the robbery. Detective Leleux also testified about the conversation he had with Parker the day he spoke to her about the robbery and she gave him permission to search her residence. Detective Leleux testified that Parker informed him appellant was upset with Ross because Ross had gone "bare faced" in the robbery and was "sloppy." Detective Leleux testified that he retrieved some clothing, including a shirt with the brand name "Coogi" on it and a pair of black and white Nike shoes, from Parker's residence that Parker said belonged to appellant and were the shoes he wore during the robbery.

Detective Dan Arizpe, a detective who was assigned to the robbery, testified he compared the black and white Nike shoes and the "Coogi" shirt recovered from Parker's residence with those appearing on the security tape of the robbery and both were very similar to those worn by one of the robbers. Detective Arizpe testified:

> Q: Did you notice any item of clothing in the bag that appeared similar to anything that you had seen on the security video from the Wells Mini Mart robbery?
> A: Yes, I did.
> Q: And specifically what did you see that was familiar?
> A: It was a Coogi shirt, it looked like it had been turned inside out, just from looking at the stitching, turned it inside out it, looks just like the jacket, the shirt that was worn in the video for the Wells.
> Q: Okay. And was there anything else in the bag that looked like it appeared on video of the Wells robbery?

A:     Same shoes and there was a hoodie that — with the Coogi shirt which looked like what the suspect was wearing in the Wells video.

Both the "Coogi" shirt and the Nike shoes were admitted into evidence.  In addition to the security video tape, two "still shots" of the tape showing a close up of the shoes and the shirt worn by the robber with a side-by-side photo of the "Coogi" shirt and black and white Nike shoes belonging to appellant were entered into evidence to show their resemblance.

Two DNA analysts testified at trial.[3]  They both testified they compared the DNA found on several items to the known reference sample of appellant's DNA.  The DNA results showed that appellant could not be excluded as a contributor to the DNA found on the gloves and ski mask found in Ross's car, and also on the "Coogi" shirt and the black and white Nike shoes matching those worn by the robber on the security tape and found at appellant's girlfriend's house.  Further, appellant could not be excluded as a contributor to the DNA on the BB gun found in Ross's car.

Based on the foregoing, after eliminating the accomplice testimony of Ross from consideration, we conclude there was sufficient evidence that tended to connect appellant with the commission of the robbery.  Accordingly, Ross's accomplice testimony was sufficiently corroborated as required by Texas Rule of Criminal Procedure art. 38.14.

**CONCLUSION**

We overrule appellant's issues on appeal.  The trial court's judgment is affirmed.

Sandee Bryan Marion, Justice

Do not publish

---

[3] One DNA analyst tested the glove, gun, and ski mask and the other analyst tested the shirt and shoes.  Both testified to their respective results.